11 W I

# United States District Court

| EASTERN | DISTRICT OF | MICHIGAN |
|---|---|---|

UNITED STATES OF AMERICA

**v.**

**D-1  LUQMAN AMEEN ABDULLAH**
(a.k.a Christopher Thomas),
**D-2  MOHAMMAD ABDUL BASSIR**
(a.k.a. Franklin D. Roosevelt Williams),
**D-3  MUHAMMAD ABDUL SALAAM**
(a.k.a. Muhammad Addul Salaam, a.k.a. Gregory Stone,
a.k.a. Gun Man, a.k.a. Norman Shields),
**D-4  ABDUL SABOOR** (a.k.a. Dwayne Edward Davis),
**D-5  MUJAHID CARSWELL** (a.k.a. Mujahid Abdullah),
**D-6  ABDULLAH BEARD** (a.k.a. Detric Lamont Driver),
**D-7  MOHAMMAD PHILISTINE**
(a.k.a. Mohammad Palestine, a.k.a. Mohammad Al-Sahli),
**D-8  YASSIR ALI KHAN,**
**D-9  ADAM HUSSAIN IBRAHEEM,**
**D-10 GARRY LAVERNE PORTER** (a.k.a. Mujahid), and
**D-11 ALI ABDUL RAQIB**

**CRIMINAL COMPLAINT**

Case:2:09-mj-30436
Judge: Unassigned,
Filed: 10-27-2009 At 09:32 AM
Sealed Matter (ml)

I, _Gary Leone_ , the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief. From on or about_2007 through the present,_ in _Wayne_ county, in the Eastern District of Michigan, defendant(s) did commit, or did aid and abet others in committing, violations of federal law, to wit:

18 U.S.C. § 371, conspiracy to violate 18 U.S.C. § 2315, by receiving and selling goods that the defendants believed were stolen from interstate shipments, as to Defendants 1, 2, 3, 4, 5, 6, 7, 8, 9, and 11;

18 U.S.C. § 371,conspiracy to violate 18 U.S.C. § 1341, mail fraud, in furtherance of a scheme to defraud and to obtain by mail the insurance proceeds from the arson of a dwelling, as to Defendants 1 and 2;

18 U.S.C. § 922(d), providing firearms or ammunition to a person known to be a convicted felon, as to Defendant 1 and 2;

18 U.S.C. § 922(g), possession of firearms or ammunition by a convicted felon, as to Defendants 1, 2 and 10;

18 U.S.C. § 931, possession of body armor by a person convicted of a violent felony, as to Defendant 1; and

18 U.S.C. § 511, tampering with motor vehicle identification numbers with the intent to further the theft of the vehicle, as to Defendant 1 and 2.

All in violation of Title_18_ United States Code, Section(s)_371, 922(d), 922(g), 931, 511 and 2_____.

I further state that I am a(n)  Special Agent, FBI  ,and that this complaint is based on the following facts:

*See Attached Affidavit Hereby Incorporated by Reference.*

Continued on the attached sheet and made a part hereof:    ☒   Yes ☐   No

Signature of Complainant
Special Agent Gary Leone, FBI

Sworn to before me and subscribed in my presence,

October 27, 2009            at    Detroit, Michigan
Date                                           City and State

Honorable Donald A. Scheer, U.S. Magistrate Judge
Name & Title of Judicial Officer                  Signature of Judicial Officer

# AFFIDAVIT

I, Gary Leone, being duly sworn, depose and state:

1.     I am a Special Agent of the Federal Bureau of Investigation (FBI) and I have been so employed for 6 years. I have been assigned to the Detroit Division for approximately 3 years, where I am assigned to a Counter-Terrorism Squad. I am familiar with and have participated in methods of investigation including, but not limited to, visual surveillance, general questioning of witnesses, use of search warrants, the authorized use of electronic surveillance (wire and oral), grand jury subpoenas, use of informants and use of cooperating witnesses. I have participated in the investigation which is the subject of this affidavit for the past three years.

2.     I am part of a team of experienced agents and officers who have been investigating the criminal activities of **Luqman Ameen Abdullah and his followers** who are located in Detroit and in cells throughout the country. Abdullah is the Imam of the mosque known as the Masjid Al-Haqq. The Masjid Al-Haqq was located in a building at 4118 Joy Road in Detroit; however, in January 2009, the group was evicted by the City of Detroit for non-payment of property taxes. It has relocated, under the same name, to a building located at 4017/4019 Clairmount, Detroit.

## INTRODUCTION

3.     The statements contained in this affidavit are based upon my own investigation, as well as upon information provided by other Special Agents and Analysts of the FBI, conversations held with detectives and officers from the Detroit Police Department and other law enforcement organizations, information provided by confidential human sources and informants, review by myself and others of consensually monitored conversations, and upon my experience and training as a Special Agent of the FBI. Because of the limited purpose of this affidavit, I have included only the evidence I believe is necessary to establish probable cause that the individuals named herein have committed federal crimes, and not every detail known to me regarding the related investigation.

4.     On that basis, I allege there is probable cause to believe **Luqman Ameen Abdullah** (a.k.a. Christopher Thomas), **Mohammad Abdul Bassir** (a.k.a. Franklin D. Roosevelt Williams), **Muhammad Abdul Salaam** (a.k.a. Muhammad Addul Salaam, a.k.a. Gregory Stone, a.k.a. Gun Man, a.k.a. Norman Shields), **Abdul Saboor** (a.k.a. Dwayne Edward Davis), **Mujahid Carswell** (a.k.a. Mujahid Abdullah), **Abdullah Beard** (a.k.a. Detric Lamont Driver), **Mohammad Philistine** (a.k.a. Mohammad Palestine, a.k.a. Mohammad Al-Sahli), **Yassir Ali Khan**, **Adam Hussain Ibraheem**, **Garry Laverne Porter** (a.k.a. Mujahid) and **Ali Abdul Raqib** have conspired together to commit federal crimes, in violation of 18 U.S.C. § 371, including:

a.     18 U.S.C. § 2315 (sale or receipt of stolen goods transported in interstate commerce);

b.     18 U.S.C. § 1341 (mail fraud to obtain insurance proceeds resulting from arson);

And have in fact violated the following federal criminal laws:

c.        18 U.S.C. § 922(d) (providing firearms or ammunition to a person known to be a convicted felon);

d.        18 U.S.C. § 922(g) (possession of firearms or ammunition by a convicted felon);

e.        18 U.S.C. § 931 (possession of body armor by a person convicted of a violent felony); and

f.        18 U.S.C. § 511 (altering or removing motor vehicle identification numbers).

5.        The investigation has shown that **Luqman Ameen Abdullah**, Imam of the Masjid Al-Haqq, in Detroit, Michigan, is a **highly placed leader** of a nationwide radical fundamentalist Sunni group consisting primarily of African-Americans, some of whom converted to Islam while they were serving sentences in various prisons across the United States. Their primary mission is to establish a separate, sovereign Islamic state ("The Ummah") within the borders of the United States, governed by Shariah law. The Ummah is to be ruled over by Jamil Abdullah Al-Amin, formerly known as H. Rapp Brown, who is currently serving a life sentence in the Florence, Colorado Supermax for shooting two police officers in Georgia.

6.        In 1981, Luqman Abdullah was convicted in Wayne County, Michigan of felonious assault and carrying a concealed weapon. Further, a check of law enforcement indices shows that in 1979, Abdullah was arrested and charged with resisting arrest and assault on a police officer by the Mobile Alabama Police Department; the disposition of those charges is unknown.

7.        Luqman Abdullah calls his followers to an offensive *jihad*, rather than a defensive *jihad*. He regularly preaches anti-government and anti-law enforcement rhetoric. Abdullah and his followers have trained regularly in the use of firearms, and continue to train in martial arts and sword fighting. Abdullah encourages members of the Masjid Al-Haqq, many of whom are convicted felons, to carry a firearm, and information obtained during the course of this investigation indicates that many of Abdullah's followers are usually armed. Abdullah preaches that every Muslim should have a weapon, and should not be scared to use their weapon when needed. Members and former members of the Masjid Al-Haqq have stated they are willing to do anything Abdullah instructs and/or preaches, even including criminal conduct and acts of violence.

# BACKGROUND

## Historical Information from Confidential Source[1] S-1

8.        S-1 is a confidential source who has admitted that he was a follower of Luqman Abdullah, a faithful member of The Ummah, and involved in their criminal activities in the past. A great deal of the information provided by S-1 has been independently corroborated by recent investigation; none of it has been refuted. S-1 has proven to be reliable and credible.

9.        In a deposition given under oath in December 2007, S-1 testified that on many occasions, he has heard Luqman Abdullah advocate the spread of Islam through violent *jihad*, and violence against the United States government and against law enforcement. Although Abdullah knows that many of his followers are felons who converted to Islam while they were in prison, he encourages them to be armed at all times in preparation for a confrontation with law enforcement. S-1 saw and participated in extensive and regular firearms and martial arts training inside the Masjid Al-Haqq. S-1 saw Luqman Abdullah discipline children inside the mosque by beating them with sticks on their hands, knees, and legs, until they were covered with bruises, including a boy Abdullah beat so badly with sticks that he was unable to walk for several days.

10.       S-1 testified that the members of the Masjid Al-Haqq are ready to use any means necessary to safeguard the mosque and its surrounding area from outside forces, whether they are members of law enforcement or local street gangs. If members need assistance or protection, they are instructed to call upon Luqman Abdullah and his followers rather than calling the police.

11.       S-1 testified that on many occasions, he heard Luqman Abdullah preach that Islam should be spread through violent *jihad*, and advocate violence against the government and against law enforcement. Abdullah told his followers that if the police try to take his weapons or try to apprehend him, he will respond with violence, and they will have to shoot him before they can arrest him. When he was a loyal follower of Abdullah, S-1 would repeatedly listen to a tape recording of Abdullah giving a *Khutba* (sermon) in 2004 and yelling, "Police, so what? Police die too! Feds die too!" and "Do not carry a pistol if you're going to give it up to police. You give them a bullet" rather than surrendering your weapons. S-1 heard Abdullah encourage his followers to "pick up guns and *do* something" rather than try to achieve their goals through peaceful means. Abdullah often refered to law enforcement officers as "the *Kafir* dogs." I know from my experience and training that "*Kafir*" is a highly derogatory term used to describe a non-Muslim, and that "*Kuffar*" is the plural form of the word.

12.       According to S-1, Abdullah has an armed group known as the "Sutra team" that is responsible for the security of the mosque and protecting its members both from law enforcement and from local street gangs. When the Masjid Al-Haqq was located at 4118 Joy Road, the members of the Sutra team carried firearms and trained in the martial arts of kickboxing, boxing, sword fighting, and other types of self-defense within the mosque itself.

---

[1]All confidential sources and undercover employees are referred to in this affidavit as male, regardless of their actual gender.

13.       On January 20, 2009, while the members of the Ummah were being evicted from 4118 Joy Road by the City of Detroit for non-payment of property taxes, the Detroit Police Department confiscated **two firearms and approximately forty knives and martial arts weapons from Luqman Abdullah's apartment inside the mosque.** The firearms have been turned over to the custody of the FBI and they are logged in to evidence. While the eviction was taking place, FBI executed a federal search warrant inside the facility. Agents found clear evidence corroborating S-1's statements that firearms training had taken place inside the mosque. There were empty shell casings on the basement floor, and large holes in the concrete wall of the "shooting range." According to S-1, all weapons and fight training was geared towards violent confrontation with law enforcement and / or with local street gangs.

### Information from Confidential Source S-2

14.       S-2 is a confidential source who has provided information about Luqman Abdullah and his associates. S-2 is proven to be reliable and credible; information provided by S-2 has been independently corroborated by other sources, and by consensual recordings he has made with the members of The Ummah at the direction of the FBI.

15.       On December 12, 2007, S-2 told me he had been with Luqman Abdullah outside the mosque on that date, and he was able to surreptitiously record their conversation. S-2 told Abdullah he had asked to donate $5,000 to pay to have someone "do something" during the 2006 Super Bowl in Detroit. Abdullah said he would not be involved in injuring innocent people for no reason: "If there's something to be done, . . . it's going to be legitimate." Abdullah acknowledged that he had been involved in weapons training even before he became Muslim, and stated:

> I mean, **things are coming**. . . . Well, see, the whole point is that you have to understand. *Kafir* is, they watch me, like, very closely. Very, very closely, you know? I mean, ridiculously closely. And, so, you know, when [*unintelligible*] and I do things, but it's all based on what's got to be done at the time. But when, uh, plots or something . . . I got some, **I got some violence [in me] because of what they did to Imam Jamil [Al-Amin]** . . .
>
> * * * *
>
> [T]he overall picture was, uh, to advance Islam. So, uh, always remember, uh, **revenge is Islamic**. But, you have to make sure it's not personal. It's very difficult. . . . But you have to start. . . . **You got to get mad about it.**

16.       In reference to video clips appearing on Al Jazeera, Abdullah told S-2:

> They send me all of this stuff. . . . CAIR and everybody send me all of this stuff. I get sick. I can't watch. . . I can't do that. The, now, what would happen if that, if I'm just dwelling on that? I can't talk right, I can't give people focus. . . .
>
> And see, we're, like for example, I got some stuff, man, **I got some soldiers with me,** so it's not like I, I don't have, you know, nothing. **Brothers that I know would, you**

4

know, if I say "Let's go, we going to go and do something," they would do it. You know. I mean, you got people who talk like they would do something, but . . . I wouldn't trust they would [do] nothing.

17.        These and other recorded statements by Luqman Abdullah confirm reporting by S-1 and S-2 that **Abdullah and his followers view themselves as soldiers at war against the United States** government, and against non-Muslims.

### Recent Information from Confidential Source S-3

18.        On October 10, 2008, S-3, an FBI confidential source who has proven to be reliable and credible in the past, was able to record additional statements by Luqman Abdullah at the mosque. During the *Jum'uah* prayer, Abdullah stated that Muslims need to cut the ties with Christians, Jews and *Kuffars*, and said there is no such thing as a good or bad *Kafir* – the only thing that matters is whether or not someone is Muslim. In reference to Christians, Jews, and the *Kuffar*, Abdullah stated:

> . . . We have to cut the ties to them, and understand, you are supposed to be the leaders. And until you act black and believe in that you are the leaders of mankind, you are going to be astray. If you can't please the Christians and the Jews. You cannot please them until you follow their religion. . .

> Obama is a *Kafir*. McCain, all the rest of them *Kuffars*, are *Kuffars*. You can't make them a good *Kafir*, bad *Kafir* . . .

> The premise of Allah, and Islam said, "the worst of [*unintelligible*], **the worst Muslim is better than the best *Kafir*."**

Abdullah went on to preach that Muslims need to stop fighting each other and start fighting the Kuffar. Abdullah stated:

> Contrary to our own [*unintelligible*], **we should be trying to figure out how to fight the *Kuffar*.** You see, we need to figure out how to be a bullet.

19.        On March 21, 2008, S-3 relayed a conversation about the illegal possession of firearms between himself, Luqman **Abdullah** and **Abdul Bassir** that occurred while they were driving to Maryland to attend a Muslim conference. Abdullah told S-3 that he is not willing to go back to jail. He stated that if police attempt to conduct a traffic stop on him, he will not stop. Abdullah told S-3 that he had once been stopped by police, who approached his car with their guns drawn. Abdullah stated that only because he was not able to get to his firearm to shoot the police officers, he fled the scene in his car, and evaded arrest in that way.

20.        On June 27, 2008, S-3 told me he had been able to surreptitiously record his conversation with Luqman Abdullah standing outside the mosque that day. S-3 reported that when he arrived at the mosque, he realized **Abdullah was wearing a bullet proof vest** under his customary

robes. Abdullah explained he was wearing it because there had been an altercation earlier with other individuals in their Detroit neighborhood who were not members of the Masjid Al-Haqq. Abdullah smiled and told S-3 that "one of the brothers" had taken care of it. S-3 told investigators that he believed this meant that a member of the group had resolved the situation through force and violence, and possibly by shooting someone.

a.          S-3 observed an individual he knows as "Abdul Rahim" standing with Luqman Abdullah, watching for the individuals who had been involved in the altercation. S-3 saw Rahim pull a handgun out of his shirt and aim it an approaching van. As the van neared, Rahim realized the people inside were not the individuals they had been involved with earlier, and Rahim put the gun back inside his shirt.

b.          Luqman Abdullah and S-3 talked about government regulations for citizens of the United States, such as driver's licenses and passports, and the following exchange occurred:

LA:     . . . how are we going [to have] Islam happen here and the Koresh, if you will, or Washington is trying to stop everything we do? . . . . . Well, yeah, but it's not just the fear factor, it's the whole point of, of knowledge. **Of understanding that "they" are my enemy, and that I should be trying to plot as to how to make moves to get some things accomplished.**

S-3:     Like them plotting on you and shutting you down, so you be plotting on them?

LA:     Yeah, that's right!  And to keep going, first of all, you know, to stay alive and survive first.

S-3 told investigators that he believes that Abdullah's reference to "*the Koresh*" is to a period in history when Muslims were expelled from land they considered their own. They returned later, stronger and more prepared, and reclaimed the land by force and violence from a non-Muslim government. Investigators believe that Abdullah plans to follow that example, and lead others to use forceful means against United States law enforcement.

21.          On July 21, 2008, S-3 spoke to **Abdul Bassir**. Bassir told S-3 that the United States government wants to take people down, and that if the government messes with Luqman Abdullah, "people will start taking heads." Bassir stated they are almost to that point already, because of the situation with Jamil Al-Amin. Investigators believe Bassir's statements indicate that the members of the Masjid Al-Haqq are considering taking illegal and violent action against the government because of the incarceration of Jamil Al-Amin.

22.          On August 5, 2008, S-3 told me he had been at the mosque that day, and had spoken with Luqman Abdullah. S-3 was able to surreptitiously recorded their conversation. Investigators reviewed and listened to the recording, and discussed the matter with S-3, and determined that Abdullah discussed his anti-government ideologies and the idea of a modern day revolution. Abdullah stated, "It might end up being where each State breaks off." Abdullah then discussed

having small Islamic States separate from the nation of the United States, "like the Amish and the Mormons in Utah." Abdullah stated,

> . . . If you get enough property, like, "Hey, leave them alone." Just like China do with the Muslims over there. . . . You get enough [*unintelligible*] where you demand your rights.

Later in the conversation, Abdullah stated,

> We can't just be saying, "O.K., everything is run by the U.S. government," **we got to take out the U.S. government. The U.S. government is nothing but *Kuffars*.** . . . Even if we was to say, "Let's get us," if we came up with a program like, "Let's get us a candidate and, you know, vote for him, vote him in and stuff like that, he's a Muslim and stuff." . . . I mean he's still got to deal with the *Kuffars* [*unintelligible*]. So Allah's not going to be with that.

Abdullah then began to talk about revolution and paraphrased another Muslim by stating,

> It's impossible to for you to take and change this thing around, trying to go through it the same way. You know, like, "OK, let me become a part of it then. I'm going to change it." You cannot do that. It don't work like that. And **you cannot have a non-violent revolution.**

Abdullah then stated that Muslims need to stand up, and things will be all right only when the people who are ruling believe "There is no god but Allah." Investigators believe Luqman Abdullah's statements confirm the information reported by S-1, that the primary mission of the target subjects is to establish a separate, sovereign Islamic state (an Ummah) within the borders of the United States, to be ruled over by Jamil Al-Amin. It further confirms that Abdullah believes this can only be done through force and violence and not by political action: "you cannot have a non-violent revolution."

23.       Also on August 5, 2008, S-3 informed me that he had made a surreptitious recording of his conversation with Luqman Abdullah in Abdullah's apartment on the second floor of the mosque. **Abdullah gave S-3 a bullet proof vest to keep**, and showed him a Scimitar sword with a blade approximately three to three and a half feet in length. S-3 saw a knife on the desk with a blade approximately six to eight inches long. Abdullah also showed S-3 a hatchet. Abdullah pointed to a plastic case on the floor and said "That's a shotgun." S-3 commented on the hatchet and asked Abdullah, "Do you throw hatchets, or no?" Abdullah replied, "Yeah, I can use a hatchet." As set out above, Luqman Abdullah has been convicted of a violent felony, and therefore it is a violation of federal law for him to have possession of either a bullet-proof vest or a shotgun.

24.       On October 10, 2008, S-3 was able to speak with Luqman Abdullah in the main assembly room on the first floor of the mosque and to consensually recorded the conversation.



Abdullah discussed the spread of Islam with S-3, telling him it is not all right to simply get along with *Kuffars*. Abdullah stated:

> **We are going to have to fight.  We going to have to fight against the *Kafir*.**

> . . . I mean if . . . Muslims run away from that.  If the only thing they trying to do is just to get along with the *Kafir*.  That's not for the *Kafir* for you to get along with.  It's for you to tell them that they're *Kafir*.  "Hey, you making a big mistake man.  You need to worship Allah."

> . . . Only thing they trying, Muslims trying to do, is like, "Just leave me alone." Man, forget about that. . . . **They smashing the Muslims all over the world and then we sit here like everything is all right.  "Just leave us alone."  I mean, no.** Everything ain't all right.  Matter of fact, you better get up from over there and leave them people alone, man.  You wrong.  It's no threat from the Muslims here.  The Muslims here are saying, you know, "Hey, just let us live here and [*unintelligible*]," that's the only thing they worried about. . . . That's not good man, I don't care.

25.    On November 30, 2008, Luqman Abdullah and S-3 discussed a document relating to the capture of Dr. Aafia Siddiqui in Afghanistan who was wanted by the FBI for questioning relating to her loitering around the residence of Ghazni's governor, in possession of instructions on making bombs and notes about installations in the United States.  The discussion revolved around the allegations of Siddiqui's defense attorney and her family, who claimed that Siddiqui had been held captive and tortured by the United States Government.  Abdullah said:

> I'll tell you what, though.  Brothers be talking about, they want to do *jihad* [*unintelligible*].  We can make some plans to do some [*sound of three audible hand claps*] . . . It ain't, it ain't got to be [unintelligible] like that. *[Unintelligible]* . . . just like they did her.  I mean I ain't talking about just grabbing somebody off the street.  You understand what I'm saying? . . . **One of them super Agents.  Trail them, follow them, know where they house is at, and everything else.  Deal with them, deal with them the way, the way they supposed to be dealt with, man.**

S-3 then asked Luqman Abdullah how he would recognize the "super Agents" and know whom to follow.  Abdullah responded by stating:

> . . . You can't, you can't deal with stuff [*unintelligible*] unless you dealing with it in a sense of organized . . . **You have to wait, watch, check out, investigate.  Same thing they do to you.  It's not that complicated man. . . . You got hundreds of Agents right down there off of, off of Michigan [Avenue].**

S-3 then clarified that Abdullah was talking about the MacNamara Building on Michigan Avenue in Detroit, which houses the FBI and the IRS.  Abdullah responded:

. . . No, not the IRS, not them. You ain't got to deal with them. I mean they [*unintelligible*], they worth the effort but, you know, you got dudes that, actual Agents that just terrorizing the people. . . . Field Agents, I mean, but the, no, they. . . . It's a whole organized effort. Look, they got cats that's on the computer. [*Unintelligible.*] I mean it's not just . . . It's a organized effort. . . . I mean everything they do, down. Organized effort to betray you. But not just you, other people too. It's not just, just Muslims. . . . Why do you think McVeigh and them [*unintelligible*]?

Abdullah then went on to state his theories about the bombing of the Alfred P. Murrah Federal Building in Oklahoma City and the first World Trade Center bombing. Abdullah relayed his belief that the FBI bombed the Murrah Building and the World Trade Center as part of a plot to blame Muslims for violence. Abdullah stated:

. . . It's no question about, he was involved in getting that stuff done. So now, you know about what happened when, when the, when the stuff jumped off . . . in Oklahoma City, when the bomb went off and stuff. Hours after that. Hours. They had already put out that it was Arabs, Muslims. Because they already had a plan about that stuff. How they was going to do it. That's the FBI. . . . I mean, see, see, McVeigh and them. Even though they did what they did, they probably was irked on, and supported and everything, by the FBI. . . . The first World Trade Center Bombing was the FBI.

Agents interpret Abdullah's comments as reiterating his belief that law enforcement should be eliminated, and that the only way to "deal with them" is through force and violence. As related above, Abdullah believes there is no way to have a non-violent revolution; jihad is synonymous with violence. Abdullah's recorded statements to S-3 confirm S-1's testimony, that **Abdullah is advocating and encouraging his followers to commit violent acts against the United States.**

26.     On February 26, 2008, S-3 went to the Masjid Al Haqq and made a consensual recording of conversations he had with Luqman **Abdullah, Muhammad Abdul Salaam, Abdul Saboor** and others. Luqman Abullah spoke to them about the importance of trust; Abdullah stated that it is the people closest to a person who will cause them the most emotional harm when trust is broken: it is not what the person does to betray him, but it is who the betrayal came from that is bothersome. Abdullah also stated that killing a person is one way to handle a person who breaks his trust. Abdullah then went into his office and called Abdul Saboor in to meet with him. When they came out, Abdullah removed a knife from his clothing and handed it to Saboor. The knife had a blade of approximately five inches in length and the total length with the handle was approximately nine inches. Saboor began violently swinging the knife in a demonstration of martial arts techniques. When he finished, Saboor returned the knife to Abdullah and Abdullah put the knife back inside his clothing. Abdullah claimed he had the capability of being able to penetrate a bullet proof vest with a knife. Abdullah's clothing had a hole in the side to allow access to the clothing underneath, and S-3 was able to see a portion of a metallic object that had the outline of a handgun and seemed to be weighing down Abdullah's clothing.

27.     Following Saboor's demonstration of martial arts techniques on February 26, 2008, Luqman Abdullah sat on the floor close to S-3, and in a low voice asked S-3 if he would be able

to "get numbers" for a 2007 Dodge Ram with only 20,000 miles on it. S-3 understood that **Abdullah was asking S-3 to help him obtain a new VIN for the truck** that "one of the brothers" had given to him. Abdullah also admitted he once had another truck which he implied was stolen. He said that one day the police came and towed it away, but they never confronted him about it.

28.     On March 21, 2008, S-3, **Luqman Abdullah, Mohammad Abdul Bassir,** and **Mujahid Carswell** (a.k.a. Mujahid Abdullah, who is Luqman Abdullah's biological son) drove to Herndon, Virginia. Bassir and Carswell were there to provide security for Luqman Abdullah. During the drive, Abdullah stated that the FBI is the enemy of Islam. Abdullah stated something to the effect, **"If they are coming to get me I'll just strap a bomb on and blow up everybody." Abdullah gave S-3 the impression that he has access to an explosive device.** Abdullah stated that he is not afraid to die for the cause. During a discussion of illegally possessing firearms, Abdullah stated that he is not going back to jail. He stated that if the police attempt to conduct a traffic stop on him, he will not stop. Abdullah said he had once been stopped by the police while he was driving a cab. The officers approached Abdullah with their guns drawn, which was the only reason Abdullah was unable to get to his gun in time to shoot them. Knowing that he was at a tactical disadvantage, Abdullah fled in the car and successfully got away. Abdul Bassir spoke of a time in which he was stopped by the police and had a stolen car on the back of his tow truck. Bassir considered himself fortunate, as he did not get in any type of trouble.

29.     On the evening of April 1, 2008, S-3 met Luqman Abdullah at the mosque, and they went for a ride in S-3's car. Abdullah again told S-3 about the stolen Dodge truck he needed a VIN for. Abdullah told S-3 to refer to the truck as the "White Lady" so they would not have to actually speak about a stolen truck. Abdullah called someone on his cell phone to see if the individual still had the truck, and to verify its make and model, but there was no answer. Abdullah told S-3 he would attempt to call the individual at a later time, and thanked S-3 for finding a similar truck that he could use to switch the VINs with those on the stolen truck. Abdullah stated that he had somebody that would be able to switch all the VINs on the vehicle for him. **Abdullah again spoke of law enforcement being the devil and evil. Abdullah informed S-3 that a member of his community in Detroit had shot police officers.**

30.     Two days later, on April 3, 2008, Abdullah told S-3 the individual wanted $2,500 for the stolen truck. Abdullah and S-3 had further discussions about Abdullah's efforts to obtain the "White Lady" on April 9, and on April 24, Abdullah asked S-3 if he could store the "White Lady" for him.

31.     On May 29, 2008, Abdullah told S-3 that the "White Lady" was in Flint, Michigan; they discussed the logistics of switching VINs. **Abdullah also told S-3 he wanted to get a passport, and said he wants to leave the United States permanently.** When S-3 asked how Abdullah would be able to maintain his leadership role in the Ummah, **Abdullah stated that he would still be able to control things from outside of the country, and that "America must fall."**

32.         On the evening of June 12, 2008, Luqman Abdullah went to S-3's place of business, where they were to switch the VIN on a stolen white Dodge Ram that Abdullah had with a VIN from a salvaged truck that S-3 acquired at the request of Abdullah for this purpose. Abdullah arrived in his Ford Ranger pickup truck, said the White Lady was still in Flint, and asked S-3 to go with him to get the vehicle.

33.         During the drive to Flint, Abdullah attempted to justify getting the stolen vehicle and illegally switching the VINs. Abdullah claimed if the acts were about Allah, and were in the cause of God, they constituted a form of *jihad* because the *kuffar* would harm them if they were to get caught. Abdullah related a story he claimed was in the Koran in which people in Mecca and Medina would rob and steal from the caravans, and then donate a portion of their ill-gotten gains to benefit Allah. **Abdullah concluded that story in the Koran justifies stealing, robbing, and other illegal acts, as long as they profit Islam.** S-3 reported that Abdul **Saboor** had previously told the same story to justify other criminal acts.

34.         S-3 and Abdullah traveled in Abdullah's Ford Ranger to Flint where they went to the Flint Muslim House mosque. Abdullah called the Imam of that mosque, because the "White Lady" was stored near his house. Abdullah drove to the house and met the Imam of the Flint mosque, who also referred to the stolen truck as the "White Lady." S-3 and Abdullah followed the Imam to a nearby house, and the Imam opened the garage door exposing the stolen white Dodge Ram pickup parked inside. The Imam and Abdullah worked together to jump start the truck, and the Imam removed a Georgia License plate from the stolen truck and kept it.

35.         S-3 drove the "White Lady" back to his place of business and Abdullah followed. They spent several hours trying to switch the VINs between the salvaged truck and the stolen truck, but were unsuccessful. Both Mohammad Abdul **Bassir** and **Abdullah** have told S-3 that the Flint Muslim House Imam knows how to properly switch the VINs on the trucks, and that he is their connection for stolen vehicles. Bassir told S-3 they know an individual who works at Chrysler who is able to get them the proper rivets that are used to secure the VIN plate on the dashboard of the truck. Bassir also said they know a man who will take vehicles with their VINs removed to Canada and crush them.

36.         S-3 and Abdullah discussed how to register the stolen white Dodge Ram truck under the VIN of the salvaged red Dodge Ram truck. Abdullah stated he will register the "White Lady" bearing the VIN from the salvaged red truck in Alabama; because the red truck was salvaged in the State of Michigan, he could not register its VIN on a different vehicle without arousing suspicion. Abdullah requested the title be registered and sent to an address in Alabama that he used for his own driver's license.

37.         On June 27, 2008, S-3 attempted to make a consensual recording with **Luqman Abdullah** at the Masjid Al Haqq. Also present were **Mujahid Carswell** and several other men known to S-3. Abdullah went to his truck, retrieved a paper and gave it to S-3 and spoke about pledging *bayaat*. The heading of the paper is as follows:

This is a writing of Abdul Kareen, the Imam of Dar-ul-Islam Movement (based on the Medinah Treaty of the Prophet Muhammed Ibn Abdullah, -pboh), with the Believers and Muslim of _____ represented by Imam _____ and those who follow them and are attached to them and who Jihad along with them.

Following the heading are the twenty-four rules of the movement.  Abdullah told S-3 to read the paper and tell him what he thinks of it.  Abdullah informed S-3 that there may be a time when he will call on him.  **Abdullah also said that the government plots and plans against them so they need to plot and plan in return and "do whatever it takes."**

38.    During their conversation on June 27, 2008, Abdullah and S-3 spoke again about the stolen truck and switching the VINs.  Abdullah said that he needed to be careful with the truck because law enforcement watches him and will try to find out how and where he got the truck. Abdullah claimed law enforcement knows the Ford Ranger he currently drives is also stolen however, it is too minor an offense so they will not arrest him for it.  **Abdullah said he believes that Allah protects him and stated that law enforcement doesn't want to mess around with him because they'll "take it to the streets" if necessary.**  S-3 asked if that would be like the standoff at Waco.  Abdullah replied that it would not be like Waco, but rather if they mess with him, **it will be a straight up war.**

39.    Also on June 27, 2008, S-3 told Abdullah he had access to **stolen merchandise** they could sell for profit.  **Abdullah said the mosque would be a good place to sell it.**  Abdullah told S-3 that he still wishes to get a passport.  Abdullah said that most of his money comes from overseas.  Abdullah looked around to ensure nobody was listening and then said **most of the money comes from Canada.**

40.    On July 24, 2008, Luqman Abdullah warned S-3 that they need to be careful in their actions because of the FBI.  Abdullah stated that **Abdul Saboor** had printed out several things from the internet including Al-Qaeda training camp manuals.  Abdullah said he told Saboor to throw them away and cautioned him not to look at things on the internet.  Abdullah told S-3 that he needs to be with the movement.  **Abdullah informed S-3 that something will happen with the Muslims "real soon"** and that they should not trust anybody.  Abdullah said he has a bullet proof vest he will give to S-3.

41.    On August 5, 2008, while Luqman Abdullah and S-3 were in Abdullah's apartment in the Masjid Al Haqq, **Abdullah explained** to S-3 that just as states and cities are separate entities under the U.S. Government, **the members of the Masjid Al Haqq are also a separate entity independent of the government under their own set of laws.**  Abdullah stated they follow Sharia (Islamic) Law.

42.    On August 7, 2008, S-3 and Luqman Abdullah drove to Chicago.  On the drive, Abdullah told S-3 that **he has provided extensive martial arts and weapons training to** his sons Umar Abdullah and **Mujahid Carswell**, as well as to **Abdul Saboor** and another man from Inkster, Michigan.  Abdullah and S-3 talked about the 12 gauge shotgun Abdullah had previously showed to S-3.  Abdullah stated that one of the attendees of the mosque pawned the gun to him.

**Abdullah told S-3 he has another 12 gauge shotgun that he may be willing to sell to S-3.** Abdullah also spoke of moving outside of the United States to set up refuge and run the organization, because the United States had made it too difficult for him to do things here.

43.     On October 15, 2008, Luqman Abdullah and S-3 joked about the night they were attempting to illegally alter the VINs on the Dodge Ram trucks. Abdullah laughed about the possibility of the FBI taking pictures of the two of them while switching the VINs. Abdullah said that the FBI would not do anything about it as it is not "big enough", and the FBI will not arrest him until they want to put him away for life. Abdullah stated something to the effect, "that's if I let them, I don't have a problem with them saying hello to my little friend." Abdullah also stated **he would deal with the FBI on his terms.**

44.     On January 8, 2009, S-3 told Abdullah that he knows a man in Chicago who is willing to give them several stolen fur coats to fence and split the proceeds. Abdullah cautioned S-3 about talking openly about it, saying "they'll play that back for you." Abdullah warned S-3 to be careful because he associated with him and "the Feds" are trying to get him. **S-3 saw Abdullah in possession of a Glock 9mm handgun,** serial number EBL271. Abdullah said he has a .38 special that is registered in Michigan; he doesn't carry it. Instead, he carries one that "might have a couple bodies" on it. Abdullah told S-3 that **everyone gets their guns from breaking into houses.** Abdullah has a lot of knives including one that will penetrate a bullet proof vest. The knife is a large Tanto knife, which Abdullah refers to as a bone crusher. Abdullah showed S-3 the knife, which was in his bag. The knife was about fifteen inches in total length, with a blade of about nine inches. The blade is very thick at the top, and tapers to an extremely fine point. Abdullah said it is made to go through a vest.

45.     On January 10, 2009, S-3, Luqman Abdullah, and Abdullah's daughter were traveling in a vehicle near Atlanta, Georgia. S-3, who was driving, saw they were being followed by a police car and told Abdullah they were about to be pulled over. Abdullah started acting very agitated and began feeling where all of his weapons were. Abdullah's daughter looked very frightened. As they were being stopped by the police officer, Abdullah told S-3 exactly where and how to pull over. Abdullah glared at the police officer while he was questioning S-3. When the officer returned to his vehicle, Abdullah started calling the officer a *Kaffir* Dog, a pig, and other names. Abdullah stated something to the effect, **"These pigs don't even know, their department will have a bad day when they deal with me."** Abdullah also told S-3, they've been trying to get him since the 1980's. Abdullah told S-3 about a time when he was arrested and was brought to the 10th precinct in Detroit for murder. When he was brought to the 10th precinct, the other officers were cheering and excited they got him. They put his photo in a line-up, however he was not picked out, therefore, he was released and not charged with the murder.

46.     Abdullah said the cops have been trying to get him for a long time because a lot of people were being killed near the mosque. Abdullah also talked about a Detroit police officer, who once arrested one of the members of the mosque who had a gun, but let him go after learning he was from the Masjid Al Haqq.

47.        After the incident on January 10, S-3 attempted to get Abdullah to take his gun off his person and hide it inside of the vehicle. S-3 told Abdullah that he would take responsibility for the weapon if they were stopped, and that he did not want to see Abdullah get in trouble for illegally possessing the gun. Abdullah refused to take off the gun, saying he carries a gun for a reason, and that's not the way it's going to go down. Later at the hotel, Abdullah told S-3 he has shot a lot of people. Abdullah said he does not know how many people, but it is "a lot." Abdullah said "brothers" (from the Masjid Al Haqq) talk about needing equipment. Abdullah said he tells them they do not need to purchase it because the enemy has it already for them. **Abdullah also tells them if they want a bullet proof vest, simply shoot a cop in the head, and take their vest.** Abdullah continued to refer to law enforcement officers as *kaffir* dogs and in other derogatory terms. Abdullah started to jump around the room making motions with his hands as if he were shooting people saying "shoot cops in the head," and "pop, pop." Abdullah said he has a lot of experience shooting cops. Abdullah also said in the 1980's a lot of people were found dead around the masjid, and the cops were scared of the people at the mosque. Abdullah told S-3 that the people at the mosque need to understand how much damage individuals can do. Abdullah said "we're not any fake terrorists, we're the real terrorists." S-3 said he smoked a lot of cigarettes after they got pulled over to calm his nerves. Abdullah told S-3 he must cut back on smoking to calm his nerves, because he might have to sit in a corner for a long while in order to wait to kill someone, and would not be able to smoke.

48.        On February 6, 2009, Luqman Abdullah gave an anti-government *Khutbah* during the *Jum'uah* service. Abdullah talked about how historically Muslims would oppose the government. Abdullah stated that there are three things that make a good Muslim: *ikhlas* (nature), prayer, and obedience. Abdullah talked about the **current need to oppose the American Government and stated that the FBI is the enemy.** Abdullah stated that two parties exist in the world, the party of God and the party of the devil. Abdullah said that only Muslims are the party of God. Abdullah also made derogatory statements about Christians and Jews. **Abdullah told his followers that they need to be with the Taliban, Hizballah, and with Sheikh Bin Laden.** Abdullah said the American soldiers who commit suicide are cowards, and they commit suicide because they are being punished by Allah. Abdullah contrasted this with the actions of Muslim suicide bombers: what they are doing is not suicide, but rather an act of blowing the enemy up. Abdullah told his followers it is their **duty to oppose the FBI and the government and it does not matter if they die.** He also told the group that they **need to plan to do something.**

49.        On February 12, 2009, S-3 and Luqman Abdullah drove to Chicago, Illinois together in order to meet an individual to get fur coats to fence (as part of the Undercover Operation, explained below). On the drive there, Luqman Abdullah said, "I shot a lot of niggers." He told S-3 details of the date and place a particular shooting occurred. Abdullah said no one has ever questioned him regarding the incident. Abdullah said that when he was a taxi driver, he picked up two girls. When he dropped the girls off, the girls ran from the taxi cab. A man approached Abdullah's taxi cab and paid him $20 for driving the girls, while another unknown male came from the other side of the cab and put a gun to Abdullah's head. The man shot Abdullah in the head and began feeling Abdullah's pockets. Luqman Abdullah then retrieved his pistol and shot both men. Abdullah explained to S-3 that he killed both individuals. Abdullah called

**Mohammad Abdul Salaam** who offered to find the guys that shot Abdullah, but Abdullah told him not to do that. Abdullah said he had gotten rid of the gun because he didn't want the police to find it. Luqman Abdullah refused to go to the hospital because he knew he had shot both men, but the next day at Jum'uah prayer, he fell over and passed out during his sermon, and was rushed to the hospital. Abdullah did not explain anything further regarding this incident.

50.  S-3 and Abdullah then drove from Chicago to Flint, Michigan with the fur coats. S-3 paid for a room at the Holiday Inn. Luqman Abdullah and S-3 were watching a police show on TV when Abdullah kept saying "blow 'em up, man, blow 'em up." He then said, "what's this here, a bomb in there? Obviously it is." S-3 told Abdullah that when he had been in prison, an inmate he met gave him the formula for trinitrotoluene (TNT). He explained to Abdullah that the inmate went over it with him everyday for probably one month. He told Abdullah that TNT in a glass looks like water, and no one could tell what it is by looking at it. **Luqman Abdullah asked if S-3 can still make TNT now.** S-3 explained to Abdullah that he hasn't thought about it in a long time, and would have to sit down and write it out on paper first. Abdullah told S-3 to not talk about it aloud anymore. **Abdullah told S-3 that if he could remember how to make TNT, that would be nice, and then he could teach Abdullah how to make the substance.** Abdullah told S-3 to check it out and see if he knows how to make it. He also instructed him to not try it at his own house and risk blowing up his children. Abdullah said try and put the formula down on paper, but he also has to test it to see if it actually works. **Abdullah then said they have to try to make it and told S-3 to figure out the formula.**

51.  On March 15, 2009, Luqman Abdullah asked S-3 if he knew where he could get a military style pistol belt. The two made plans to go to an Army supply store so Abdullah could get a gun belt.

52.  On March 18, 2009, Luqman Abdullah and S-3 went to Harry's Army Surplus, 2050 North Telegraph Road, Dearborn, Michigan. While they were in the store, **Abdullah told S-3 that the bailiffs took his weapons from the second floor of the Masjid Al Haqq** the day they were evicted. Abdullah looked at pistol holsters, military belts, gun straps, knives and face masks that cover the entire face. Abdullah asked the sales clerk if she had a strap to fit a specific "Air Soft" AR-15 type rifle, but they did not. **Luqman Abdullah told S-3 that he needed a military belt because he has a military gun, an M-15**, which is similar to the "Air Soft" rifle in the store. Abdullah purchased a green padded rifle strap. He did not purchase a face mask because the shop only had winter ones.

53.  Luqman Abdullah gave S-3 a Compact Disc labeled "Convert to Islam" which S-3 described as pro-Taliban propaganda. Abdullah said he had received it from Abdul Saboor.

54.  That same day, March 18, 2009, S-3 gave Luqman Abdullah a piece of paper with what he told Abdullah was a **recipe for Trinitrotoluene (TNT),** because Luqman Abdullah had asked S-3 to write it down for him. **Abdullah told S-3 that he would not use it "until it was time."** Later that day, S-3 spoke to Abdullah on the telephone. S-3 told Abdullah that he needed to double check something with the formula and instructions for making TNT that he had given Abdullah earlier that day. Abdullah stated that he still had the paper with him and agreed to meet

S-3 at **Ali Raqib**'s store, which they were using as the mosque after the eviction from 4118 Joy Road. S-3 asked Abdullah if he wanted him to try to make the TNT. Abdullah told S-3 to make it and said he would like to be there. S-3 told Abdullah he would make a video of the test, however, Abdullah instructed him not to. Abdullah cautioned S-3 to be careful.

55.     Referring to the face mask that Abdullah was looking for earlier in the day at Harry's Army Surplus Store, S-3 asked Abdullah if he needed the face mask that night. Abdullah said that although he did not need it for that night, he would like to obtain one soon. Abdullah told S-3 that he did not have anything planned for that night in particular, but said **"you never know when you will need it."**

56.     On April 1, 2009, Luqman Abdullah gave S-3 a video titled "The Terrorist Next Door," which is a true story about the terrorist who tried to smuggle explosives across the border in Washington State during Y2K in an attempt to commit a terrorist attack, but was stopped and his attempt was foiled. Abdullah told S-3 to watch the video, and it would give them something to talk about.

57.     On April 2, 2009, S-3 picked up Abdullah from his house and drove him to Alabama. On the way, Abdullah and S-3 discussed the movie. Abdullah talked about the recruitment of terrorists by a terrorist cell. **Abdullah said the terrorist's mistake was that he should have had the explosive ready to detonate in case he got stopped. Abdullah said he waited too long, and it was unprofessional.** Abdullah didn't agree with bombing civilian targets such as buses, which occur in Israel and the West Bank, but said it is **fine to bomb police stations.**

58.     In discussing their January 2009 eviction from the Masjid Al-Haqq at 4118 Joy Road, Abdullah said he has something planned for "them," but now is not the right time. Abdullah did not expound on this further. Abdullah said S-3 will know when he is needed, and that is why it is important to stay in communication with each other. Abdullah said that when things happen, he wants to be in the city, as opposed to in the woods, because he would be better able to avoid apprehension and arrest in the city; he would be able to maneuver better in an urban area. Abdullah talked about the need to dig tunnels to prepare for this eventuality. Abdullah told S-3 about a time that he was eluding law enforcement. Abdullah stated that as the police were chasing him using a helicopter, he attempted to shoot at them, however his rifle misfired because they had made their own ammunition and they had used too much powder.

59.     On April 19, 2009, **Abdullah inquired if S-3 had spoken to Mohammad Philistine about obtaining more stolen merchandise to be fenced. Abdullah told S-3 that the group needed money** to host a Shuraa' Counsel meeting for the Ummah. Abdullah talked about overthrowing the United States Government and said they **also need resources "to smash those people."**

60.     On April 24 and 25, 2009, S-3 attended the Al-Ummah National Shuraa' which was hosted by Luqman Abdullah and the Masjid Al-Haqq in Detroit. On April 24, Abdullah led the

16

*Jum'uah* service. During his *Khutbah*, Abdullah preached his typical rhetoric about the *kuffar* and the police and the need to establish a separate Islamic government.

61.        On May 15, 2009, Luqman Abdullah led the *Jum'uah* service. S-3 characterized Abdullah's *Khutbah* as being very extreme and described Abdullah as being "fired up," at times yelling. Abdullah preached that **they should make America like Saudi Arabia, where the Muslims took control by fighting and dying.** Abdullah told his audience that although they may have a plan as individuals, they need to come together as a whole. While pointing towards 4118 Joy Road, where the Masjid Al-Haqq had been located, Abdullah said "What they did to us is not over." Abdullah said they need to maintain *Sabr* (patience). Abdullah repeatedly spoke about the need to carry out their mission, however, he never provided the details of what the mission was. Abdullah encouraged the attendees to purchase homes in the neighborhood of the new mosque. Abdullah said that they hate the Jews and that God hates the Jews.

62.        Abdullah also preached that they can not merely be lukewarm in their religion, that they must be winners. Abdullah said they need to start "right here at Joy Road." He said that the government in America is nothing and has no power. Abdullah also spoke negatively about Americans in Saudi Arabia and *Khuffar* in the Arab Peninsula.

63.        On May 21, 2009, Luqman Abdullah, S-3 and another man left Detroit at approximately 6:00 a.m., after the morning prayer, in order to travel to Montgomery, Alabama to meet with an Ummah Imam who had recently been shot by the police. S-3 attempted to make consensual recordings of his conversations with Abdullah during the trip. Due to the long duration of the trip, it was not possible to record every conversation.

64.        During the drive, **Abdullah told S-3 about a murder charge he beat in the past.** Abdullah said "the Feds" have been after him for a long time, and he believes he has not been arrested because Allah is merciful to him and protects him. Abdullah stated something to the effect, **"The FBI knows that I will kill them." Abdullah also stated that the police are his targets too, not just the FBI.** On two different occasions during the trip while espousing anti-government rhetoric, Abdullah said he is "getting ready to meet Allah." Abdullah said that he has not been sleeping well at night because he does not know when the police are going to come after him.

65.        At one point in the evening, S-3 and Abdullah were in the hotel room alone. Abdullah talked about the need to be careful in using a computer and the internet because that is how people get in trouble. Abdullah said he would like to get C4 or another type of explosive. Abdullah said that although he does not need the explosives, having them would be helpful for what he needs to do. At this point, the third man came back into the room, so the conversation ended.

66.        On the evening of May 22, 2009, Abdullah, S-3 and the third man went back to Montgomery, Alabama for a study session that Abdullah was asked to lead. Before the class started, Abdullah talked to the attendees about the times he shot other people. Abdullah gave details about how he shot his victims and how their bodies reacted from the shots. Abdullah was

very excited and animated about this and even acted the events out and showed them the scars he obtained from being shot during the altercations. Abdullah admitted he shot one person seven times with a .22 caliber gun. Abdullah said that he was questioned by the police about the incident. Abdullah talked about a second shooting he committed with an AK and how he had to get rid of the gun. Abdullah said that he was never questioned by the police about this incident.

67.        On May 23, 2009 in Alabama, Luqman Abdullah spoke about the Dar-Ul Movement, and said they were a military force to be reckoned with. According to Abdullah, an Imam from New York is the leader. Jamil Al-Amin and Luqman Abdullah are members, as are Abdullah's close associates from Las Vegas, Philadelphia and Cleveland. Abdullah stated he had participated in training camps, which were located in various states, with *Jawallah* (soldier) scouts.

68.        According to Abdullah, people from Saudi Arabia wanted to fund many of the Muslim groups in the United States, but wanted them all to join together as one group. Dar-Ul could not agree with all the other groups, so they split apart. Two years before Abdullah joined the movement, a shooting happened in New York and several Dar-Ul people were killed. Jamil Al-Amin said they had to divide the group because having too many people in one organization made them an easy target. According to Abdullah, the group is still Dar-Ul, but this is not widely known because of the United States government. The Ummah is a cover name for Dar-Ul.

69.        On June 19, 2009 while they were in Gainesville, Georgia, S-3 heard Luqman Abdullah tell the Ummah Imam that he knows that somebody in the Masjid Al Haqq is working for the Feds. Abdullah told the Imam that a young man had asked him about going overseas to fight. Abdullah said that he is hopeful that anyone who is working for the Feds will come to the mosque often to pray, will see the error of his ways, and admit he has been working with the Feds. Then he will be on the inside. Abdullah also said that if somebody is trying to gather information on him, he would kill them himself or have them killed. Abdullah said that he has people who would be happy to handle the problem. Abdullah also said that he knows he is being listened to and targeted by law enforcement so he intentionally makes conflicting statements in order to protect himself.

70.        At one point, Abdullah spoke to the Gainsville Ummah Imam's children, who were between approximately 9 and 11 years old. Abdullah told them stories about his shooting people with a 9mm gun. Abdullah said that sometimes he carries two handguns and said that he had shot a lot of people.

71.        On June 19, 2009 while they were in a hotel room in Gainesville, Georgia, S-3 and Abdullah were watching a television crime show that involved a discussion of how to dispose of a body. S-3 recommended putting the body in concrete. Abdullah stated that there would be no time to do something like that and that it would be too difficult. Abdullah told S-3 in a matter of fact way that the bodies should just be buried. Also while watching television, there was a **program with a nuclear bomb in it. Abdullah said that he just needs a little bomb. When S-3 asked Abdullah what his target was, Abdullah whispered, "Washington."**

18

72.        On July 8, 2009, Abdullah paid S-3 $1,250 for his role in the July 1, 2009 acquisition of the purportedly stolen television sets (part of the Undercover Operation, below). Then Abdullah got into S-3's vehicle and placed three rounds of .38 special caliber ammunition on the dash board. Abdullah told S-3 he had a .38 caliber handgun and asked S-3 if he had anything. Abdullah said that he originally acquired the gun for someone else, so he could protect himself. **Abdullah then removed a loaded .38 special caliber revolver from his back and put it on the center console of S-3's vehicle. Abdullah told S-3 that he could pay him $190 or $200 for the gun.** S-3 gave Abdullah $200 for the gun, from the $1,250 that Abdullah had just paid him. Abdullah cautioned S-3 not to get caught with the gun and said that it is advantageous that it is a revolver because "it will not leave anything behind" (i.e., spent shell casings). Abdullah told S-3 to keep it on his person rather than hidden in the car in case he got pulled over. Abdullah told S-3 that he needs to be able to get his gun out before the cops get theirs. Abdullah also told S-3 that the cops cannot search his person unless he is arrested. In addition to the handgun, Abdullah gave S-3 the five rounds of ammunition that were loaded in it, as well as the three rounds he placed on the dashboard. After he left Abdullah, S-3 immediately contacted FBI and turned over a .38 special caliber revolver, described as an IND NAC DE ARMAS-BRASIL, Model 3, Serial Number 032576, with 8 rounds of .38 special ammunition. The weapon and ammunition are being maintained in evidence.

73.        On August 19, 2009, S-3 went to the Masjid Al-Haqq. Luqman Abdullah discussed a *hadith* (an account attributed to the Prophet Muhammad) in which **he claimed the Prophet Muhammad said that it is okay to participate in theft; as long as that person prays, they are in a good state.**

### Mohmamad Abdul Bassir

74.        **Mohammad Abdul Bassir** (a.k.a. Franklin D. Roosevelt Williams) has several felony convictions, including a 1989 conviction for armed robbery, a 1998 conviction for carrying a concealed weapon, and a 2009 conviction for carrying a concealed weapon. Bassir is currently serving a two-year sentence in the State of Michigan Department of Corrections. Bassir is a devout member of The Ummah and has been a close associate of Luqman Abdullah for over twenty years. Bassir routinely traveled with Abdullah throughout the country, often providing armed security for him. As set out in detail below:

a.        **Bassir sold handguns to S-3 on four separate occasions:** November 12, 2007, December 17, 2007, January 25, 2008 and November 7, 2008. S-3 was being supervised by FBI Detroit during each purchase, and the conversations between Bassir and S-3 were recorded. After each purchase, S-3 immediately turned the weapons over to FBI, and they have been maintained as evidence.

b.        Although Bassir is a convicted felon, he continued to carry a firearm. On numerous occasions during consensual recordings with S-3, Bassir has threatened to shoot law enforcement officers. On the evening of September 28, 2008, Abdul Rahim, another member of the Masjid Al-Haqq, was involved in a shooting that occurred at a gas station on the corner of Linwood and Joy Roads in Detroit. Abdul Bassir admitted to S-3

that **on September 29, 2008 that he and Muhammad Abdul Salaam drove Abdul Rahim from Detroit to Philadelphia, Pennsylvania, because he was "bringing unwanted attention to the mosque."** A search of Detroit Police Department records confirmed a response to the gas station on September 28, 2008 due to a report of shots fired.

    c.           In October 2008, Bassir told S-3 that he was planning to pay an associate to **burn down his house so he could collect insurance money.** On October 20, 2008, Bassir's house did, in fact, burn down. Later, during a consensually monitored conversation, Bassir admitted to S-3 that he had hired someone to burn down his house so he could collect the insurance money, and Bassir explained in detail how the arson was carried out. Bassir has filed an insurance claim. Detroit Fire Department Arson Squad is investigating the house fire as being of suspicious origin.

    d.           Bassir has been **an active participant in a conspiracy to sell or receive goods stolen from interstate shipments,** as set out below (see Undercover Operation, below).

75.         On November 6, 2007, in a conversation S-3 was able to consensually record, Bassir said **he wanted to obtain a silencer for his 9 mm Glock pistol** because "you never know when you will need one." Bassir told S-3 if anybody ever crosses him, they will "get it." Bassir and S-3 spoke about the United States Government, President Bush, and Jewish people and how these people mistreat Muslims. Bassir also spoke about conspiracy theories surrounding the attacks on September 11, 2001. Bassir said brothers need to stick together and be willing to die for the cause, and **blood needs to be shed in order to change things.**

76.         Bassir said he had not had time to practice shooting since he started his towing business; he used to shoot with others, and he would like to go shoot with S-3 in the future. Bassir said he believed he could get a .45 caliber handgun for S-3, but warned that they need to be careful about handguns as they both have felony records. Bassir said he believes he has been blessed by Allah: since his felony conviction, even though he has been caught twice with firearms, he has not gone back to jail.

77.         On November 7, 2007, S-3 spoke again with Bassir, and Bassir showed S-3 the handgun he had previously described to S-3. Bassir removed the gun from a holster on his right hip inside of his pants. The gun was nickle or gray in color with a wood-like grip, and requires a 7.62 round. The wording TOK CZECH was stamped on it. The gun and magazine were loaded with approximately ten rounds. Bassir made it clear to S-3 that if somebody were to try to confront him, he would not hesitate to use the weapon.

78.         On November 12, 2007, S-3 made a consensual recording of a conversation he had with Mohammad Abdul Bassir. **Bassir gave S-3 a .45 caliber LLAMA pistol, serial # 484842, and two magazines.** One magazine was empty and the other was loaded and in the pistol, including one round in the chamber. Bassir stated that his friend wanted $300.00 for the weapon. S-3 asked Bassir to bring the weapon back in a few days to give him time to obtain the $300.00. Bassir stated that S-3 could keep the handgun and that he trusted S-3 would pay him later.

Bassir did not want to transport the gun with him for fear of getting caught with it. S-3 kept the handgun and 7 rounds of ammunition which were in the one magazine. S-3 immediately turned the gun, magazines, and ammunition over to the FBI. On November 15, 2007, S-3 paid Bassir $300.00 in U.S. Currency provided by the FBI for the handgun.

79.    On December 17, 2007, S-3 made a consensual recording of a conversation he had with Mohammad Abdul Bassir. **Bassir removed a .45 caliber Tauris pistol from his waistband and gave it to S-3.** Bassir stated that he forgot that he had the pistol at his house. Bassir told S-3 the lowest he could sell the gun for was $450.00. The pistol had a loaded magazine in it, however Bassir stated he took the round out of the chamber prior to bringing it to S-3. Bassir stated that although he already had a conviction for armed robbery, he would rather be caught with the gun on him than caught without a gun when he needed it. Bassir stated that he may have the ability to get S-3 an AK-47. Bassir agreed to S-3 paying him the $450.00 later in the week. On December 19, 2007, S-3 paid Bassir $450.00 provided by the FBI for the Tauris .45 caliber handgun he had received from Bassir two days earlier, and recorded their conversation.

80.    On January 25, 2008, **Bassir gave S-3 a brown leather bag with a .44 magnum caliber Ruger Redhawk handgun inside of it.** Bassir and S-3 discussed the handgun, including the fact that the hammer and trigger had been replaced. Bassir and S-3 discussed the possibility of being sentenced to five years incarceration if they were caught with a firearm. Bassir stated that if anybody were to try to arrest him, he has 17 shots to use to against them. Bassir stated that Imam Luqman Abdullah is the only individual at the Masjid Al-Haqq who carries a .44 caliber handgun. Bassir was not able to obtain any .44 ammunition to go with the handgun. Bassir also stated that Abdullah is very proficient in martial arts and is a master of deceit and deception. S-3 was able to consensually record the conversation.

81.    On March 21, 2008, while on a trip to Herndon, Virginia with Luqman Abdullah, Mujahid Carswell and S-3, they stopped overnight at a hotel. **S-3 saw Abdul Bassir place a 9mm Glock, Serial number AGV473, handgun under his pillow.** The following morning, March 22, 2008, the group prayed in Luqman Abdullah's room. There, S-3 witnessed a handgun sticking out from under Luqman Abdullah's pillow as well.

82.    On July 21, 2008, Bassir told S-3 that he has two houses in his name, and he rarely uses one of them. Bassir said he wanted to burn it down and collect the insurance money on it. Bassir spoke out against the United States Government stating that the government wants to take down people. Bassir said that **if the government messes with Imam Luqman Abdullah, people will "start taking heads." Bassir also said that they are almost to that point because of the situation with Jamil Al-Amin.**

83.    On September 18, 2008, Abdul Bassir met with S-3 and said because times are financially tough, he plans on paying an individual $500 to burn his house down in order to collect the insurance money. Bassir will pay the individual $250 up front and $250 when the arson is completed. Bassir said his neighbor, who Bassir called an "old dope guy" and "the King of Martindale," told him his nephew has burned two houses for him for the insurance money.

Bassir said he arranged to have the individual to burn the house down on October 16, 2008, because Bassir would be working as a DJ at a cabaret that night, so he would have an alibi.

84.     On October 7, 2008, S-3 met Bassir at his home at 7541 Hanover Street in Detroit. Bassir again stated he would be at a cabaret when the nephew of the "King of Martindale" burns his house down. S-3 saw a kerosene heater in Bassir's house, and **Bassir said they would stage the arson to appear to be an accident caused by the kerosene heater.** Bassir said he had been slowly removing his important possessions from the house, but he would leave most of the items in the house so it would not look suspicious. The house is insured, however, the personal property inside the house is not.

85.     On the morning of October 13, 2008, Abdul Bassir met with S-3. S-3 attempted to record their meeting, but the recording device malfunctioned. S-3 reported their conversation to me as follows: Bassir talked about his financial trouble and explained that is the reason why he was going to "strike a match," referring to his plan to have his house burned for insurance purposes. Bassir stated one time he received $45,000, and a year later received $35,000, but he did not explain any further. Bassir said he had considered robbing a bank, saying he did not worry about being caught and going to jail. Bassir said he would take the bank manager and tell him that he would kill him if a silent alarm were activated and the police responded. Bassir claimed that he learned from Jamil Al-Amin that one does not have to appear angry in order to let somebody know that you would kill them. Bassir suggested the members of the mosque should start wearing their hats backwards like gang members and start shooting police in the head and letting them try to figure out who was doing the shooting. Bassir said the police need to worry about being killed because the members of the mosque have been notified that they are going to be evicted, and they have to worry about that.

86.     On the afternoon of October 17, 2008 at the Masjid Al-Haqq, Abdul Bassir told S-3 the arson of his house was going to happen late on the following day. Bassir told S-3 he hoped the roof burns, and that he intended to pay the arsonist half the money in advance and half when the job is completed.

87.     On October 21, 2008, S-3 spoke to Abdul Bassir, who told S-3 he was going to meet with an insurance adjuster to see what damage was done to his house. **FBI drive by surveillance of 7541 Hanover Street verified that the house had burned. A kerosene heater which appeared to have been in a fire was on the front porch of the address.** A check of the Detroit Fire Department records shows they responded to a fire at the address on October 20, 2008, at approximately 10:09 p.m.

88.     On the afternoon of October 25, 2008, S-3 spoke to Bassir at the Masjid Al-Haqq. Bassir stated that the King of Martindale's nephew was the arsonist. Bassir said that the nephew is a professional and burns houses all the time and has never been caught. The nephew wears rubber gloves and rubber boots so he does not leave evidence. The nephew **made it appear that a kerosene heater exploded.** Both the insurance company, and Muhammad Abdul Salaam's friend who is the insurance adjuster, determined the fire damage caused a total loss to the house worth $20,000.00. Bassir said he does not understand why the insurance company is contesting

it as an arson, because neither the arson investigators, nor the dogs found anything. Bassir said that he prayed about the arson during Ramadan and as a result believed it was appropriate to continue with it. **Bassir also stated that he talked to Luqman Abdullah about committing the arson and Abdullah was supportive of it.**

89.      On November 2, 2008, Abdul **Bassir asked S-3 if he wanted to buy the TOK handgun** he had in November 2007 for $550.00, which would include the gun, two magazines and approximately 100 rounds of ammunition. On November 5, 2008, Bassir agreed to allow S-3 to pay $450.00 when he got the gun, and the balance of $100.00 when S-3 could get the money. On November 7, 2008, **Bassir sold the gun, two magazines, and multiple rounds of ammunition to S-3 for $550.00.**

90.      On June 11, 2009, Luqman Abdullah told S-3 that Muhammad Abdul Salaam's friend, who is the insurance adjuster that Abdul Bassir used, said that investigators are looking to arrest Bassir for arson. Abdullah said that the individual who was originally hired to set the fire became spooked because there were people around the house. Therefore, the man taught Bassir how to set the fire himself. Abdullah also said that Bassir came up with an alibi in order to evade detection.

### Muhammad Abdul Salaam

91.      **Muhammad Abdul Salaam** (a.k.a. Muhammad Addul Salaam, a.k.a. Gregory Stone, a.k.a. Gun Man, a.k.a. Norman Shields) is believed to have a significant position of authority within the Masjid Al-Haqq, and is considered to be the First Emir. Salaam has at least five prior felony convictions, beginning in 1977 and continuing through at least 1985, including convictions for carrying a concealed weapon, larceny from a person, and fraudulent activity.

92.      Salaam is a devout follower and close associate of Luqman Ameen Abdullah. Salaam has pledged *bayaat* to Abdullah. When Salaam is called upon to preach, he reiterates the same violent rhetoric as Abdullah. S-1 told investigators that Salaam is referred to as "the gun man" because he has a large cache of weapons stored at various residences, including pistols, AK-47s, Mini 14s, 45 Commandos, 12 gauge shotguns, and other rifles. Salaam is known to be one of the firearms instructors at the Masjid Al-Haqq. Further, **S-1 testified that he witnessed Salaam murder an individual Salaam believed had killed his brother.**

93.      **Salaam participated in the conspiracy to steal and fence merchandise from interstate shipments (as part of the Undercover Operation, see below) on three separate occasions.**

94.      As indicated above, on September 29, 2008, Muhammad Abdul **Salaam and Mohammad Abdul Bassir drove Abdul Rahim from Detroit to Philadelphia, Pennsylvania to help Rahim evade arrest** after a shooting involving Rahim occurred.

**Abdul Saboor**

95.　　　**Abdul Saboor** (a.k.a. Dwayne Edward Davis) has been charged with several violent and drug crimes in Wayne County, Michigan, but available records do not establish that he has any felony convictions.

96.　　　Saboor conducts martial arts training for the members of the Masjid Al-Haqq. One of the disciplines Saboor teaches is "Lahas": Saboor told S-3 that the purpose of Lahas is to kill the enemy, and that Muslims should practice martial arts because many people are trying to hurt them. Saboor taught S-3 many types of strikes that he referred to as "death blows," as well as techniques designed for use with a knife. Saboor told S-3 he would also instruct him in the actual use of swords, bats, sticks, and knives.

97.　　　S-3 has observed Saboor in the main assembly room of the target facility, teaching martial arts to children as young as 7 years old, and beating them severely as part of their "training."

98.　　　**Saboor has participated in the conspiracy to steal and fence merchandise from interstate shipments** (as part of the Undercover Operation, see below).

**Mujahid Carswell**

99.　　　**Mujahid Carswell** (a.k.a. Mujahid Abdullah) is Luqman Abdullah's oldest biological son. He has no prior felony convictions. He is known to carry a .40 caliber handgun and to be a member of the Sutra team at the mosque. S-3 has observed Mujahid Carswell "training" children as young as 7 years old in martial arts, and beating them with his hands and with a stick to instill bravery and obedience in them. Mujahid Carswell has expressed a willingness to participate in firearms training with S-3 on multiple occasions. S-1 related having seen Mujahid Carswell use toilet bowl cleaner to clean up blood in the basement of the Masjid Al-Haqq following a murder S-1 witnessed there.

100.　　　On February 8, 2009, Carswell told S-3 that he wants to get a "warmer" and/or a "heater," which S-3 took to mean a firearm. Carswell said that he wanted something small and said that if he does get one, it will be easier to make a move. Carswell did not explain further.

101.　　　Carswell stated that he has moved to Windsor, Canada and is living two blocks from the tunnel border crossing. Carswell said he goes to a large masjid in Windsor and the people there are serious and organized. The mosque is also affiliated with CAIR. Carswell said he trains approximately sixty children, ages 8 to 18, in martial arts at the mosque.

102.　　　Carswell talked about his philosophy and approach to committing crime. Carswell cautioned S-3 not to talk about criminal activity because other people will hear them. Carswell also told S-3 that he should not often talk to Luqman Abdullah about all of the criminal activity. Carswell told S-3 that if he tells Abdullah once about the activity to not repeat it. Carswell told S-3 that law enforcement waited forty years to get Jamil Al-Amin, and they are still trying to get

24

Abdullah. Carswell said that although Abdullah is still a soldier and will do whatever they need him to do, that they have a responsibility to shield him because he has a higher role.

103.    **Carswell said that people at the Masjid Al Haqq have different roles.** In talking about the importance of silence relating to criminal activity, Carswell used the example of somebody being a "butcher." Carswell stated that the butcher may need to butcher a person, however nobody should know about it except the person that needs to know. Carswell said that he wanted to go overseas to get money and then return to help out. Carwell did not explain this further.

104.    **Carswell has participated in the conspiracy to steal and fence merchandise from interstate shipments** (as part of the Undercover Operation, see below).

105.    On February 25, 2009 Mujahid Carswell told S-3 he could get S-3 marijuana any time he wanted. Carswell also told S-3 that he found a buyer for what Carswell believed were stolen laptops.

106.    On March 3, 2009 Mujahid Carswell met with S-3 and UCE-1 to discuss selling what Carswell believed were stolen laptops and stolen fur coats. Carswell told UCE-1 he wanted to buy the laptops from UCE-1, and asked for 50 laptops at $150 each. Carswell proposed paying UCE-1 $3,000 up front, and $3,000 after the laptops were sold. UCE-1 told Carswell he could obtain the laptops by stealing them from either warehouses and/or trucks. Carswell offered to sell cocaine to UCE-1 for cash, but he did not want to trade merchandise for it. Carswell asked UCE-1 whether he could obtain vehicles. Carswell also discussed selling what he believed were stolen laptops and fur coats from UCE-1 with S-3. Carswell said he would sell them to buyers for $700, and said it would be "like buy one, get one free." Carswell also stated he could get UCE-1 "some nose candy" and act as the middle man and make an "extra few bucks." Carswell said the "numbers" from the laptops "shouldn't come up 'cause we not going to report them stolen at all, but then, he's going to have his people report them stolen." Carswell elaborated that if "somebody came knocking on my door" to ask about the laptops he would tell them he got them "from Joe Shmo on the corner" or "from that crack head."

107.    On March 5, 2009, Mujahid Carswell took photographs of what he believed were stolen fur coats in the back of S-3's vehicle. Carswell said he knows "some low, low level" police officers that run license plate numbers for him. Carswell and S-3 picked up a man Carswell called "Taleb." Referring to the fur coats, Carswell told Taleb "We need to get these niggers off yester week." After Taleb left, Carswell said they needed to get "front money" to acquire the laptops from UCE-1. Carswell suggested they could sell the fur coats on E-bay, since the coats do not have serial numbers and there is "too much shit to track" on E-bay. Carswell told S-3 he could rent the fur coats to a guy that makes music videos. Carswell said to S-3 that in the past some of his "associates" have killed people in the mob.

108.    On March 13, 2009, Mujahid Carswell told S-3 that he was having trouble coming up with the $3,000 for a down payment on the laptops he believed were stolen, but he would call

UCE-1 to discuss it. On March 16, 2009 Mujahid Carswell sent S-3 a text message requesting the brand of the fur coats he believed were stolen.

109.     On March 18, 2009, Mujahid Carswell asked S-3 what types of laptops UCE-1 was going to provide, how many "gigs" and the screen sizes, while Carswell was on the telephone with an unidentified male. Carswell told S-3 that he would bring the laptops across the border between the United States and Canada one or two at a time to avoid scrutiny.

110.     On March 20, 2009, Mujahid Carswell told S-3 that he could get the Toshiba laptops, which he believed were stolen, for $500 or $600 on E-bay, and the Toshibas are better than the Sony's that UCE-1 is providing. Carswell said that due to the price on E-bay, he would only pay UCE-1 $3,000 for the laptops. Carswell suggested they need to "undercut E-bay."

111.     On March 20, 2009, UCE-1 called Mujahid Carswell. Carswell told UCE-1 to bring all 50 laptops. Carswell stated he needed to know the specifics of the laptops so he could look up prices. Carswell sent UCE-1 a text message which read, "Hey, don't forget to have the 2 personal ones us aswell. LOL!" UCE-1 replied, "Laptops r Sony viao bz560p22 and Toshiba satellite pro 300 pssbeu 009004."

112.     On March 21, 2009, Mujahid Carswell told S-3 his buyer wants 40 of the laptops which he will sell for "10 grand." Carswell stated after they pay UCE-1 his $6,000, he and S-3 will have "2 stacks apiece." Carswell said he did not want his buyer and UCE-1 to meet.

113.     On March 21, 2009, UCE-1 sent Mujahid Carswell a text message which read, "Mu-what's the word." Carswell replied, "GREEN LIGHT it's all a GO! Lets make it happen." UCE-1 replied, "Need 2 work out paymnt details-u got time 2 talk?" UCE-1 called UCE-1 and discussed the details for Carswell to receive what he believed were stolen laptops.

114.     On March 23, 2009, Mujahid Carswell told S-3 that he had a buyer for what he believed were stolen laptops. His buyer "should've come up with $7,500 already." S-3 told Carswell that UCE-1 had a place where they would meet to take possession of the laptops. Carswell asked S-3 if he would get a "sales bonus" for finding a buyer of the laptops. Carswell suggested giving UCE-1 only "5 grand" rather than the agreed upon $6,000 for 50 laptops. Carswell said his buyer was coming from "over there" indicating Canada.

115.     On March 24, 2009, Mujahid Carswell traveled from Canada to the United States to meet with S-3 and UCE-1 to take possession of the laptops which he believed were stolen. Carswell and S-3 took 6 of the laptops from UCE-1 and met Mohammad Philistine near the Masjid Al-Haqq on Joy Road. Palestine paid Carswell $5,000, and S-3 and Carswell met again with UCE-1. UCE-1, S-3 and Carswell went to a warehouse and UCE-1 provided 34 more laptops. Carswell inquired about receiving video game systems from UCE-1. S-3 and Carswell gave 32 of the laptops to Palestine and Palestine paid Carswell an unknown amount of money. Carswell gave S-3 $4,730; of which, $750 went to Luqman Abdullah, $2,000 went to UCE-1 and $1,980 was for S-3. Carswell stated he would provide the remaining $500 to UCE-1. Carswell took one

laptop across the border into Canada and left one with S-3. Carswell stated he would get the other laptop at a later date so he would not be suspicious carrying two laptops across the border.

116.      On March 30, 2009 Mujahid Carswell told S-3 he had been detained at the United States and Canada border as he came back into the United States. Carswell stated he had never been stopped before but now had been stopped the "last two times." Carswell told S-3 that if he or UCE-1 had anything to do with him being detained, he would find out.

117.      On March 31, 2009, Carswell told S-3 "they" are watching him because of his father, Luqman Abdullah. Carswell said he will keep crossing the border until they all know him and they just let him pass through. Carswell stated the "deals are legit on paper" referring to the laptops he believed were stolen. S-3 reminded Carswell that Carswell still owed UCE-1 $500 but Carswell said UCE-1 still owes him 10 computers and UCE-1 will not get "shit" until he gives him the computers.

118.      On April 5, 2009, Mujahid Carswell sent 2 text messages to UCE-1 which read "Hey! Can U send me those product number again!" UCE-1 replied, "Let me c if I can find them again." Carswell replied, "Yup." Carswell sent another text which read, "Call me." UCE-1 called Carswell and told him that matters from the previous laptop deal were not resolved. Carswell inquired about getting more laptops which he believed were stolen and discussed what types UCE-1 could get. UCE-1 and Carswell also discussed what other electronics that could be bought or sold in the future.

119.      On April 11, 2009, UCE-1 sent Mujahid Carswell a text message which read, "Mu-u gonna b around on wed/thurs this wk?" Carswell replied, "Yup!" UCE-1 replied, "Cool, lets sit down on thurs." Carswell replied, "k."

120.      On April 14, 2009, UCE-1 text messaged Mujahid Carswell asking him "Mu-we still on for thurs?" Carswell replied, "Sure, why not!" UCE-1 replied, "Excellent-bonefish for eats?" Carswell responded, "Ok, found anything?" UCE-1 replied, "We'll discuss thurs, thnk ull like. J's good 4 thurs 2."

121.      On April 16, 2009, Mujahid Carswell, S-3 and UCE-1 met at Fishbone's restaurant in Detroit to discuss future deals with what Carswell believed was stolen property. UCE-1 told Carswell he could not obtain more laptop computers yet because it would not bring attention to the warehouse where he steals them from. Carswell told UCE-1 that he understood. Carswell told UCE-1 that he could move televisions after UCE-1 told him he knew of a shipment. Carswell told UCE-1 that he could get him "weed" but not cocaine due to the higher criminal sentencing.

122.      On April 22, 2009, Mujahid Carswell sent a text message picture to UCE-1 of UCE-1 he had taken at Fishbone's restaurant on April 16. The picture of was labeled "Chicago JOHN." UCE-1 replied to Carswell, "Mu, whats up with da pic? May have something coming our way. I'll call u this wknd if I hear. Now lose tht pic!" Carswell replied, "Already Did. Sent it to you instead of the trash. LOL!" UCE-1 replied, "No more pics! Not good in my busnss-undrstnd?"

Carswell replied, "1st off, it was an accident didn't even know it gotchu. The phones done it more than once before. Get'n a new one 2morrow! 2nd kill the UNDERSTANDS, I GET IT!"

123.　　　On April 23, 2009 S-3 confronted Mujahid Carswell about taking UCE-1's picture. Carswell told S-3 that it had been an accident and when he got into an argument with his wife, he accidentally sent the photo. Carswell said if he wanted to do something to UCE-1, he could have slapped him with his pistol and taken his truck the first time they met.

### Abdullah Beard

124.　　　**Abdullah Beard** (a.k.a. Detric Lamont Driver) is a member of the Masjid Al-Haqq's armed security team, and a confidant of **Luqman Abdullah**. He has no known criminal convictions.

125.　　　On December 1, 2008, S-3 met with **Abdullah Beard**; he was able to record their conversation. From agents' review of the tape and my subsequent conversation with S-3, I determined that on that date, Beard told S-3 he had been **staking out a check cashing store located in the City of Detroit, and he is planning to rob the owner of the store when he leaves with his receipts at the end of the day.** Beard told CHS-1 he had spoken to **Luqman Abdullah** ("the Imam") about his plan, and Abdullah **told him "just be careful."** In part, their conversation was as follows:

> Beard:　　I told the Imam, though. . . . What I was planning on, yeah.
>
> S-3:　　Well, did he co-sign it, I mean . . .?
>
> Beard:　　Yeah. He, you know, he was, was, he like, he like, you know, "Just be careful." He said, you know, just what, I'm going to tell you this. . . . I'm going to tell you right now, it's a, it's a, um, a check cashing place. . . . You know what I'm saying?
>
> S-3:　　Uh-huh.
>
> Beard:　　And I seen the guy come out with the money and all that, you know, and I was with my wife, and shit. We parked, well, we were getting some gas, on Joy Road, this is not, yeah, it's on Clairmount, uh, uh, right here on Linwood. . . . You know that gas station, BP, there's a check cashing place right across the street. . . . I seen it when he come out, he had a bag of money and shit.
>
> S-3:　　A big bag of money, huh?
>
> Beard:　　Big bag, I saw [*unintelligible*]. . . . bag, one guy. He came out, I been trying to be on top of him, but . . .

28

| S-3: | As far as time wise? |
|---|---|
| Beard: | I couldn't, yeah, he like, he like, he like, 'cause I was on him for a couple days, and I'm sitting there waiting, I got to find, I got to get some binoculars, and [*unintelligible*]. . . . I need some of them [*unintelligible*] so I can sit and watch him, you know what I'm saying? I got his, uh, plate number and all of that shit, so . . . We going to see what's up, man, it's like, time wise, and he, he like, you know, shifted times on me and shit, so I got, you know. |

The two men then discussed how dangerous such a robbery might be, and Beard said that if the man just gives up the money, he would not necessarily be hurt:

| Beard: | Don't get popped over it, you know what I mean, it ain't worth it. |
|---|---|
| S-3: | Right. |
| Beard: | Might be about a hundred, two hundred, you never know, 'cause [*unintelligible*] cash [*unintelligible*]. . . . Everything. They say there ain't no, there ain't no limit to what they can cash. |

126.    S-3 and **Abdullah Beard** talked about the plans for the theft of merchandise (the UCO), and Beard said he would also be there to help with the theft, and for anything with his fellow Muslims. Beard stated that he used to hunt, and he considers hunting to be a good form of training. Beard said it had been a while since he has participated in this type of training. Beard told S-3 that if he were to go to the basement of the Masjid Al-Haqq, he would see all of the bullet holes in the wall from when they used to shoot down there.

127.    The UCO shipment of stolen property occurred on December 4, 2008. S-3 met **Abdul Bassir, Adam Ibraheem,** and **Abdullah Beard** at the target location as planned, to wait for the call from the UCE meet him to aid in the theft of the property. S-3, Bassir, and Abdullah **Beard** went to Bassir's house on Lawton Avenue in Detroit. Adam Ibraheem also traveled to the housing units. While in Bassir's home, S-3, Bassir and **Beard** talked about the plan to help in the theft that night, as well as plans to participate in future thefts including the possibility of acquiring a warehouse to aid with this activity. The three also discussed participating in firearms training and the need to find a place to do so.

### Mohammad Philistine

128.    **Mohammad Philistine** (a.k.a. Mohammad Al-Sahli, a.k.a. Mohammad Palestine) resides in Windsor, Ontario, Canada. Luqman Abdullah told S-3 that Philistine is "a soldier and a warrior" and stated that he and Philistine would do anything for each other.

129.    Philistine has come into Detroit from Canada and he has taken an **active role fencing the purportedly stolen merchandise from the FBI Undercover Operation** (described below) on

at least three occasions.  Abdullah told S-3 that Palestine is a business man, and they can do a lot more business with him in the future.

130.    Philistine has told S-3 that he has been involved in other criminal activity, and that he has provided financial support to Luqman Abdullah and his cause.

### Yassir Ali Khan

131.    **Yassir Ali Khan** is an associate of Mohammad Philistine.  **Khan has fenced merchandise he believed to be stolen from interstate shipments** (as part of the Undercover Operation) on at least two separate occasions, as described below.

### Adam Hussain Ibraheem

132.    **Adam Hussain Ibraheem** has four felony convictions, the first in 1995 and the most recent in 2007.  All the convictions are fraud-related.

133.    Ibraheem has participated in the conspiracy to steal merchandise transported in interstate shipments.  On December 4, 2008, S-3 met **Abdul Bassir, Adam Ibraheem,** and **Abdullah Beard** at the Masjid Al-Haqq to wait for the call from the UCE meet him to aid in the theft of merchandise.   He was also involved in the January 14, 2009 UCO shipment.

### Ali Abdul Raqib

134.    **Ali Abdul Raqib** is a long-time follower and close associate of Luqman Abdullah.  Raqib is one of the more prominent individuals in the Masjid Al-Haqq.  After the group was evicted from 4118 Joy Road in January 2009, Raqib volunteered to have them use his place of business as the makeshift Masjid Al-Haqq, until a better site could be located.  Raqib has no felony convictions.  In 1997, he was charged with a misdemeanor traffic violation, pleaded guilty, and was placed on 12 months probation and fined.

135.    **Raqib has participated in the purchase and fencing of merchandise** he believed to be stolen from interstate shipments (as part of the Undercover Operation) on August 19, 2009.

136.    In addition, on October 14, 2009, S-3 saw Raqib at the Masjid Al-Haqq.  Raqib told S-3 that he was evicted from his storefront on Joy Road, so he moved his store into his house on Taylor Street.  Raqib invited S-3 to go see it, and gave him a tour of the house.  Raqib told S-3 that Abdullah told him they have about **50 tool kits remaining to be sold.  Raqib told S-3 he would be able to help fence some of the tool kits.**  Raqib knew that **Muhammad Salaam was selling the tool kits** and said that he does not want to step on Salaam's toes.

### Garry Laverne Porter

137.    **Garry Laverne Porter** (a.k.a. "Mujahid") is a convicted felon.  In 1997, Porter was convicted of carrying a concealed weapon and sentenced to two years probation.  Therefore, there

30

is probable cause to believe that on August 19, 2009, Garry Laverne Porter committed the federal crime of **possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g).**

138.    While he was at Muhammad Abdul Salaam's house on August 19, 2009, Luqman Abdullah began talking to an individual he called "Mujahid" and who has been subsequently identified by the FBI as Garry Laverne Porter. Porter is an attendee of the Masjid Al-Haqq and rarely misses *Jum'uah* on Fridays. After Abdullah finished talking to Mujahid, Abdullah asked S-3 if he knew anybody that would be interested in purchasing a 12 gauge shotgun or a carbine rifle. Abdullah said the shotgun is a pump action and the rifle does not have a clip. S-3 told Abdullah that he would take both guns. Abdullah then called Mujahid, and approximately forty-five minutes later, Mujahid returned in his truck. Luqman Abdullah approached the truck and called S-3 to come over. **Mujahid removed a 12 gauge shotgun and a .30 caliber carbine rifle from a black garbage bag and showed them to Abdullah and S-3. S-3 took the guns and placed them in his vehicle. Abdullah paid Mujahid for the guns. Mujahid said that he also owned an AK and a Tommy Gun.** S-3 asked Mujahid if he wanted to sell the AK. Mujahid said he did not because he is keeping it for jihad and the war.

139.    Abdullah told S-3 that he paid Mujahid $380 for the two guns, which S-3 turned over to FBI. The guns are being maintained as evidence. They are a Mossberg 500A 12 gauge shotgun, serial number J561005; and a .30 caliber M-1 Rifle, Plainfield Machine, Dunellen, New Jersey, serial number 51006.

## THE UNDERCOVER OPERATION

140.    In November 2008, FBI obtained authority to launch a Group I Undercover Operation (UCO). Abdul Bassir and other members of the Masjid Al-Haqq had told S-3 they were willing to fence stolen merchandise, and the purpose of the UCO was to provide opportunities for anyone who was interested to participate in the theft of, and later in selling, goods they believe have been stolen and transported in interstate commerce.

141.    As set out in detail below, to date there have been ten undercover events involving conspiracy to sell or receive stolen goods worth over $5,000 that had been transported in interstate commerce. At his own request, Luqman Ameen Abdullah has received at least one-fifth of the total profit from each of the ten transactions, which occurred on the following dates and involved the active participation of the individuals named:

a.    December 4, 2008:    Mohammad Abdul Bassir, Abdullah Beard, Adam Ibraheem

b.    January 14, 2009:    Mohammad Abdul Bassir, Abdullah Beard, Adam Ibraheem

c.    February 12, 2009:    Luqman Abdullah

d.    March 25, 2009:    Luqman Abdullah, Muhahid Carswell, Mohammad Philistine

e.    April 29, 2009:    Luqman Abdullah, Yassir Ali Khan, Mohammad Philistine

31

f.    May 28, 2009:        Luqman Abdullah, Yassir Ali Khan, Mohammad Philistine

g.    July 1, 2009:         Luqman Abdullah, Muhammad Abdul Salaam, Abdul Saboor

h.    July 24, 2009:        Luqman Abdullah, Abdullah Beard, Abdul Saboor, Mohammad
                           Abdul Salaam

i.    August 19, 2009:      Luqman Abdullah, Ali Abdul Raqib, Mohammad Abdul Salaam

j.    October 8, 2009:      Luqman Abdullah, Mohammad Abdul Salaam

### First UCO Transaction

142.    On November 16, 2008, Abdul Bassir sat in S-3's vehicle and they talked about
participating in the theft of merchandise. S-3 asked Bassir whether he had talked to Imam
Luqman Abdullah about it, and whether Abdullah approved; Bassir told S-3 he would be
surprised what Abdullah would agree to, as long as they consistently attend prayer services, put
the "Dean" first, and donate some of the proceeds to the mosque. Bassir said that in the past,
Abdullah has approved of when he and others have "hit a lick"; Bassir told S-3, he would not
believe what they have done in the past with Abdullah's approval.

143.    Abdullah Beard (a.k.a. Detric Lamont Driver) walked by S-3 and Bassir while they were
discussing the plans. Beard told Bassir to let him know when something was going on. Bassir
told S-3 to give him a day or two to find somebody else to help. Bassir asked Beard for his cell
number and told him that they have something coming up next week. Beard said he would help.
Bassir agreed to meet with S-3 and his supplier, an individual who was in fact an undercover
employee with the FBI (hereinafter UCE-1), to discuss the plans for moving the stolen
merchandise.

144.    On November 18, 2008, S-3 went to the Masjid Al-Haqq and met with Bassir. In
discussing the plans for moving the stolen merchandise, Bassir said he wishes just the three of
them (S-3, Bassir, and Abdullah Beard) could do it. Bassir stated that if they need a fourth
person, Adam Hussain Ibraheem could help, since he has done things in the past.

145.    Later that evening, S-3 and Abdul Bassir went to the Coney Island on Michigan Avenue
and met with UCE-1. The three discussed plans to steal merchandise from trucking companies.
Bassir said that he has experience in dealing with stolen items and worse. Bassir did not further
expound on that statement. At the conclusion of the meeting, the UCE-1 gave S-3 and Abdul
Bassir each $100 cash as a good faith payment for them meeting with him and agreeing to help
him in the future with the theft.

146.    After the meeting at the Coney Island, S-3 and Abdul Bassir returned to the Masjid
Al-Haqq. Bassir stated that he was happy with UCE-1 and excited about the planned thefts.
During the drive to the mosque, Bassir told S-3 to drive better because he was carrying a gun and

they should not give "the devil" a reason to come after them. S-3 took this to mean the police. After arriving at the mosque, Bassir went into the security room and talked to Adam Ibraheem and Abdullah Beard.

147.    After S-3 left the mosque on November 18, 2008, Bassir called S-3. S-3 was unable to record this unexpected phone call. Bassir told S-3 that he told Beard and Ibraheem about the plans for the stolen goods. Bassir said that he gave each of them $20 and told them to be ready to help with little notice. Beard and Ibraheem said they are both willing to help when needed.

148.    On November 23, 2008, S-3 went to the Masjid Al-Haqq and spoke with Luqman Abdullah, Abdul Bassir, and Adam Ibraheem. Abdul Bassir told S-3 that Adam Ibraheem, and Abdullah Beard were both willing to participate in their plan to aid in the theft of merchandise, and that he hoped it would occur soon. Later, S-3 gave Adam Ibraheem a ride to house on Ohio Street. Ibraheem asked S-3 for more information on the plan to take part in the stolen merchandise. Ibraheem said that Bassir told him the leader of the theft ring has a lot of money and there is a lot of money to be made. Ibraheem was excited about the plan and asked S-3 if it would happen during the current week.

149.    On November 28, 2008, S-3 and Abdullah Beard talked about their upcoming plan to participate in the theft of stolen merchandise from trucking companies. Luqman Abdullah warned that they must be patient in their activities because if they carelessly rush things without proper planning, things could go wrong. Abdullah told S-3 and Beard that they need to give 1/5 of the proceeds of the stolen goods to him for the mosque. Abdullah told them they need to keep Allah first. Abdullah claims that giving 1/5 of the proceeds, the "dirty" money is purified.

150.    On November 30, 2008, S-3 again talked to Luqman Abdullah about the plan for S-3, Abdul Bassir, Adam Ibraheem, and Abdullah Beard to participate in the theft of merchandise from trucking companies. S-3 asked for permission to do so. Luqman Abdullah said that he would not say no, as long as they agreed to give him 1/5 and don't forget about Allah. Abdullah further explained that he is to be given 1/5 of the total proceeds and the remainder of the money can then be divided among the participants. Abdullah asked how S-3 knew the man from the trucking company who requested the help in the thefts. Abdullah cautioned S-3 to remember that he is being watched as a result of associating with him. Abdullah told S-3 that they need to conduct counter-surveillance and to "watch the watcher."

151.    On December 3, 2008, Bassir and S-3 discussed the fact that Abdullah wanted 1/5 of the proceeds they make on the stolen property. S-3 and Abdul Bassir met with UCE-1 at the American Coney Island on Michigan Ave. Bassir assured UCE-1 that the other individuals (Beard and Ibraheem) who will be helping with the theft of the merchandise were "solid." Bassir said that he helped raise them and brought them up. UCE-1, Bassir and S-3 discussed the plan to steal the merchandise on the following evening. UCE-1 gave S-3 $1,000 in cash as partial payment up front and stated they would receive another $1,500 the following night after completion of the theft.

152.    Following the direction of Luqman Abdullah that he should receive 1/5 of the total proceeds from the thefts, S-3 told Bassir that he would equally divide the $1,000 among himself, Bassir, Adam Ibraheem, Abdullah Beard and Luqman Abdullah.  Bassir told S-3 that rather than receiving his share equaling $200 that night and $300 the following night that he wanted $500 at that time, and S-3 could pay the others their total $500 the following night.  S-3 agreed and gave Bassir $500.

153.    Following the meeting, S-3 and Bassir returned to the Masjid Al-Haqq.  Approximately twenty people were standing in front of the mosque.  Mohammad Abdul Salaam was standing near Luqman Abdullah.  S-3 gave Abdullah $200, his share of the $1,000.  Abdullah thanked S-3 and told him that he wanted to spend time the following day to go over something in the Koran.

154.    On December 4, 2008 at approximately midnight, FBI Detroit conducted an undercover operation in Detroit, Michigan involving the staged theft of an interstate shipment of goods.  Two FBI UCEs participated.  During the undercover operation, Abdullah Beard assisted other members of the Masjid Al Haqq ( Mohammad Abdul Bassir, Adam Hussain Ibraheem, and S-3) in physically moving multiple pallets of goods from one semi-truck trailer to another.  The value of the goods exceeded $5,000.00.  Prior to moving the goods, an FBI UCE cut a metal seal to the door of the truck containing the goods with bolt cutters allowing access to the load.  The cutting of the seal was completed  in the presence of the Adam Hussain Ibraheem and the other members of the Masjid Al Haqq.  After the goods were moved, an FBI UCE provided a total of $1,500.00 in FBI investigational funds, the remainder of the payment for assisting with the theft of goods.

155.    On December 8, 2008, Abdul Bassir asked S-3 if he heard from UCE-1 regarding future participation in stealing merchandise, and whether UCE-1 was satisfied with their previous work.  S-3 and Luqman Abdullah went into the security room of the mosque together.  Abdullah told S-3 that neither Bassir, Abdullah Beard or Adam Ibraheem told him about how the theft of the stolen merchandise went a few days before.  As Abdullah previously instructed S-3 to give him 1/5 of all proceeds, S-3 gave him $300, which was the balance he owed Abdullah, and explained that it was his portion from the theft of the stolen goods.  Abdullah was very excited to get the money and said that he wished to give some of it to Jamil Al-Amin's wife, Karima.

156.    On January 6, 2009, S-3 met with Mohammad Abdul Bassir at Bassir's house.  Bassir said that he was hoping "John" from the trucking company would have something good for them to steal.  Adam Ibraheem called S-3 while S-3 was at Bassir's house, and inquired about plans to aid in the theft of merchandise from the trucking company.

**Second UCO Transaction**

157.    On January 11, 2009, while driving back from Atlanta, Georgia to Detroit, S-3 and Abdullah talked about the need to give Abdullah 1/5 of all the proceeds from illegal activities, including the theft of merchandise in which S-3 and other members of the Masjid Al Haqq have been participating.  S-3 also told Abdullah about the availability of some stolen furs that he could get in order to fence.  Abdullah explained that when he is given 1/5 of the proceeds from illegal

34

acts, it purifies the money. Abdullah stated that they are at war, and any Muslim that doesn't know that, is an idiot. Abdullah stated that the illegal activity is justified because they are at war.

158.    S-3 and Abdul Bassir met UCE-1 to discuss plans to break into a truck the following night and steal the merchandise. Bassir, Abdullah Beard, Adam Ibraheem, and S-3 were to participate. UCE-1 gave Bassir $500 cash after the conversation as payment up front and agreed to pay the group another $1,000 at the conclusion of the theft, for a total of $1,500. As agreed upon earlier, Luqman Abdullah was to be paid $300, which equals 1/5 of the proceeds. Abdul Bassir said that Muhammad Abdul Salaam had contacts in order to fence some of the stolen goods. Bassir told S-3 that he would talk to Salaam about it. Bassir stated that they could probably fence stolen plasma televisions, laptop computers and appliances.

159.    After dropping Bassir of at his house, S-3 also returned home. S-3 remembered that Bassir had placed a handgun in the glove box of his vehicle, and did not recall him removing it. S-3 opened the glove box and saw Bassir's handgun, a Colt Challenger, .22 caliber, with a blue steel barrel and a brown grip, Serial number 34896-C.

160.    On January 13, 2009, UCE-1 met with S-3 and Mohammad Abdul Bassir. UCE-1 explained to Bassir that he was stealing a load of merchandise from a distribution center, and he would need help unloading the stolen merchandise and moving it to a rental vehicle. The merchandise consisted of energy drinks that would be shipped to a buyer in Florida. Bassir advised UCE-1 that the same individuals that had assisted in the previous job would help out again. After the meeting, the UCE-1 paid Bassir and S-3 a total of 500.00 of FBI investigational funds, which UCE-1 described as an advance payment for assistance in stealing the truckload of merchandise planned for the following evening. Bassir also expressed a willingness to fence stolen property for UCE-1. Bassir identified televisions and appliances as goods that he believed he could sell for UCE-1.

161.    On January 14, 2009, FBI Detroit conducted an undercover operation in Detroit involving the staged theft of an interstate shipment of goods. The operation involved the CHS and three FBI undercover employees. During the undercover operation, Abdallah Beard assisted Mohammad Abdul Bassir, Adam Hussain Ibraheem, and S-3 in physically moving multiple pallets of goods from one semi-truck trailer to another truck. The value of the goods exceeded $5,000.00. Prior to moving the goods, an FBI UCE cut the seal to the door of the truck containing the goods allowing access to the load. After the goods were moved, an FBI UCE provided a total of $1,000.00 of FBI investigational funds to the four individuals as the second part of the payment for assisting with the theft of goods, and paid Bassir an additional $200.00 "tip." Beard split the money equally with the other three individuals.

162.    The following day, S-3 spoke to Luqman Abdullah, who confirmed that Bassir paid him his portion (1/5) of the money, equaling $300.00.

### Third UCO Transaction

163.       On February 12, 2009, S-3 and Luqman Abdullah drove to Chicago, Illinois together in order to meet an individual to get fur coats which were purportedly stolen. During the afternoon hours, S-3 and target met up with FBI UCEs to transfer purportedly stolen furs from Illinois to Michigan. S-3 pulled into a garage, the doors closed behind them, and S-3 moved the stolen furs from the truck into his vehicle. The UCE explained to S-3 and Abdullah that they (UCEs) already received an insurance payoff for the furs. Abdullah stayed in the vehicle throughout the transaction. The UCE told Abdullah to take care of the furs and Abdullah agreed he would. When the deal was done, Abdullah told S-3 to not speak about the stolen furs, but did tell him that he wants 1/5 of the proceeds from the stolen furs.

164.       When S-3 and Abdullah arrived in Flint, Michigan, S-3 paid for a room at the Holiday Inn that Abdullah chose, because Abdullah said he always stays there when in Flint. Luqman Abdullah helped S-3 unload the furs from his vehicle by placing them on a luggage cart, which they rolled into their hotel room. Luqman Abdullah was looking around and quickly moved the furs. S-3 told Luqman Abdullah the furs are probably worth $3,000, and Abdullah said he would rather have the money for the furs, than the furs themselves. Luqman Abdullah said S-3 should speak to Muhammad Abdul Salaam, and his son, Mujahid Carswell, to help sell the furs.

165.       On March 5, 2009, S-3 and Mujahid Carswell met in order for Carswell to photograph the "stolen" fur coats that Abdullah and S-3 had brought back from Chicago. Carswell attempted to fence the coats.

### Fourth UCO Transaction

166.       On March 3, 2009, S-3, UCE-1, and Mujahid Carswell met to discuss what was portrayed to Carswell as the theft of goods from an interstate trucking shipment that was coordinated by UCE-1. Carswell expressed a willingness to fence stolen property for UCE-1. Carswell told UCE-1 that he could fence 50 laptop computers. Carswell and UCE-1 agreed that Carswell would pay approximately $3,000 to $3,500 to UCE-1 upon receiving the computers and the same amount after they were sold. Carswell also told UCE-1 that he is able and willing to sell him illegal narcotics.

167.       On March 25, 2009, S-3, UCE-1, and Mujahid Carswell met to conduct a transaction with lap top computers Carswell believed had been stolen. FBI had acquired 50 laptop computers to be used in a controlled delivery of purportedly stolen property. During the undercover meeting, UCE-1 delivered 40 purportedly stolen laptop computers to Carswell and in return was paid $5,500 of a previously agreed upon price of $6,000. Carswell agreed to pay UCE-1 an additional $500 in the near future. Carswell sold at least 38 laptop computers to Mohammad Philistine and Yassir Ali Khan. S-3 reported that Carswell kept two laptops for himself. The operation and delivery took place, in part, at the warehouse procured by FBI Detroit for covert operations.

168.       That same day, March 25, 2009, S-3 spoke to Luqman Abdullah and was invited to come to Abdullah's house. S-3 gave Abdullah the $750 which was his portion of the proceeds from

the fenced laptops. Abdullah appeared to S-3 to be very excited and pleased with the money. Abdullah stated that he had talked to Mohammad Philistine, who was not happy with Mujahid Carswell because Carswell was not honest regarding the sale of the laptops. Abdullah told S-3 that it is important to be upright and just. Abdullah admitted to S-3 that he knew about the fencing of the laptops which Abdullah believed to be stolen, and said he had arranged the deal behind the scenes. S-3 believes that Philistine and Abdullah talked about the laptops prior to purchasing them.

169.         On March 27, 2009, Luqman Abdullah told S-3 that he had spoken to Muhammad Philistine, and in the future, Philistine wants to deal with Abdullah rather than Carswell regarding the fencing of stolen items provided by the UCE.

### Fifth UCO Transaction

170.         On April 29, 2009, S-3 and Luqman Abdullah met with UCE-1. During the meeting, UCE-1 delivered 24 laptop computers to Abdullah. UCE-1 advised Abdullah that computers were "stolen." Abdullah paid UCE-1 cash for the computers, then delivered them to a fence he called "Yassir" (identified by FBI as Yassir Ali Kahn) who is employed by an Arabic Canadian resident identified as Mohammad Philistine, a.k.a. Mohammad Palestine, a.k.a. Mohammad Al-Sahli. Philistine gave Abdullah the money to pay UCE-1 for the purportedly "stolen" laptops.

### Sixth UCO Transaction

171.         On May 28, 2009, had a telephone conversation with Muhammad Philistine. S-3 notified Philistine that "John" (UCE-1) had "stolen" laptop computers for them to purchase and fence. Philistine asked if "John" could also obtain Burberry purses and I-phones. Palestine said that he would not be able to meet with S-3 to pay for the laptops and pick them up, but Yassir [Khan] could.

172.         S-3 then talked to Yassir on the phone. They discussed meeting so that Yassir could pay S-3 for twenty laptop computers. S-3 told Yassir that he would also be getting an extra computer as they were short one computer the last time.

173.         After the calls, S-3 picked up Luqman Abdullah. Abdullah, S-3 and Yassir Khan agreed to meet at the Islamic Center of Detroit (ICD). There, Yassir Khan paid Abdullah $5,000.00. Abdullah counted the money and then gave it to S-3.

174.         S-3 and Abdullah traveled to a warehouse to meet "John." S-3 paid "John" $3,000.00 for the 21 laptop computers. "John" advised Abdullah that the computers had been stolen and shipped to Michigan. Together, S-3 and Abdullah loaded the computers into S-3's vehicle. While he was inside the warehouse, Abdullah saw pallets of power tools and cigarettes. "John" told Abdullah that he could get power tools for them to purchase and that he could use some people to help in switching the old cigarettes into boxes of new cigarettes.

175.         S-3 and Abdullah then met Yassir Khan back at the ICD and delivered the laptop computers to him. S-3 then drove Abdullah back to his house. S-3 gave Abdullah $1,000.00, and kept $1000.00 for himself. Abdullah thanked S-3 and said something to the effect of, "Let's keep it up." Abdullah also said that he would use some of the money to help fix up the house on Clairmount Street in Detroit that they plan to use as their next mosque.

### Seventh UCO Transaction

176.         On July 1, 2009, S-3 and Luqman Abdullah met with UCE-1 at a covert warehouse in Dearborn, Michigan. During the meeting, UCE-1 delivered ten 40 inch LCD television sets to Abdullah. UCE-1 advised Abdullah that the televisions were "stolen." FBI surveillance teams observed Abdullah take the televisions from the warehouse in his vehicle and then load the television sets into his residence. **Saboor and Salaam assisted Abdullah** in fencing the television sets. UCE-1 advised Abdullah that he could keep the televisions as a partial payment for services Abdullah could provide UCE-1 in assistance of an up coming theft of a shipment of cigarettes orchestrated by UCE-1.

### Eighth UCO Transaction

177.         On July 1, 2009, an FBI UCE met with Luqman Abdullah and S-3. The UCE explained in detail that he needed help in stealing a load of cigarettes and substituting damaged unmarketable cigarettes for them, and asked Abdullah if he could supply manpower to assist in the theft. Abdullah agreed.

178.         On July 24, 2009, FBI Detroit conducted an undercover operation at a warehouse in Dearborn, Michigan. As he had been instructed by Abdullah, S-3 went to the Masjid Al-Haqq. Luqman Abdullah had recruited Abdullah Beard, Muhammad Abdul Salaam and Abdul Saboor to help with the cigarettes. Luqman Abdullah told the group that they need to be mentally prepared for whatever might come -- they need to be prepared to die and should prepare as if they are going to war. Abdullah told them that "the Feds" were watching them and said that they need to get to the warehouse, do the work, and get out quickly. Abdullah said that they knew what they were doing was illegal. Abdullah was talking to S-3 and Abdul Saboor about the Feds, and Abdullah made a statement about blowing up the Federal building. Abdullah pointed to S-3 and said he "will make some for me." S-3 believes this is in reference to previous conversations with Abdullah, when they discussed whether he could make TNT. When Abdullah Beard came into the room, Luqman Abdullah made another statement about blowing something up.

179.         During the operation, Luqman Abdullah, Abdullah Beard, Abdul Saboor, and Mohammad Abdul Salaam met with two FBI UCEs and S-3. While inside of the warehouse, an FBI UCE explained that he had several pallets of damaged cigarettes. The UCE explained that he also had several pallets of good cigarettes that were supposed to be distributed to vendors. The UCE indicated that he intended to steal the good cigarettes by removing them from their containers and filling the containers with the bad cigarettes. The UCE explained that he needed assistance from Abdullah, Beard, Saboor and Salaam, who would remove the good cigarettes from their packages and replace them with bad cigarettes. The subjects were would then disguise

the stolen cigarettes by concealing them in empty "Kleenex" boxes, which would then be loaded on to a separate truck. The UCE explained that the repackaged damaged cigarettes would be delivered in place of the good cigarettes, thus reducing the immediate reporting of the stolen good cigarettes.

180.    After the FBI UCE explained the procedure, the members of the Masjid Al Haqq began to physically remove the good cigarettes from their packaging, replace them with damaged cigarettes, and then hide the good ("stolen") cigarettes in empty Kleenex boxes for placement onto a second truck. The staged theft and packaging took approximately three hours to complete. Once completed, an FBI UCE provided Luqman Abdullah with a total of $2,500.00 of FBI investigational funds as partial payment for the Masjid Al Haqq members' participation in the theft. In total, over 150 cases (6,000 cartons) of cigarettes were repackaged into Kleenex boxes for a total of approximately $200,000 worth of retail priced cigarettes.

### Ninth UCO Transaction

181.    On August 19, 2009, S-3 went to the Masjid Al-Haqq. Luqman Abdullah discussed a hadith (an account attributed to the Prophet Muhammad) in which he claimed the Prophet Muhammad said that it is okay to participate in theft; as long as that person prays, they are in a good state.

182.    Abdullah approached S-3 and asked what time they were supposed to meet with "John" (UCE-1). Abdullah also discussed which vehicle they would take in order to pick up the televisions from "John" that they were supposed to get. S-3 called "John" to inquire as to the size of the TVs. Abdullah and S-3 agreed that Abdullah's Ford Ranger pickup truck was not large enough to haul all ten of the televisions. Abdul Saboor offered the use of his van but said he would have to go home and remove the seats in the back. Abdul Saboor was making telephone calls, telling the person he was speaking to about the televisions. Saboor asked Luqman Abdullah how much he wanted for all ten televisions. Abdullah told Saboor he wanted $500.00 each. Saboor then told the man on the phone, they were $500.00 each.

183.    Ali Abdul Raqib overheard the conversation between S-3 and Luqman Abdullah about getting the "stolen" televisions for resale. Raqib offered the use of his light blue Chevrolet pickup truck and Abdullah accepted. While Raqib drove his truck to get gas, Abdullah drove, with S-3 as a passenger, to his house. Abdullah told S-3 he had to go get the money for "John" and went into his house. Abdullah came out of his house with money in his hand. Abdullah drove to the warehouse to meet John and Raqib followed in his truck.

184.    Once at the warehouse, Abdullah spoke to "John" while S-3, Raqib and UCE-2 talked. They told Raqib about the theft of the cigarettes that a group of them from the Masjid Al-Haqq previously participated in, and showed Raqib some of the expired cigarettes that were still in the warehouse. Abdullah paid UCE-1 $1,500.00 in cash and told him that he would receive the remaining balance of $1,500.00 later that evening. Abdullah previously agreed to pay UCE-1 a total of $3,000.00 for ten 46" Toshiba HDTVs and asked John why it took so long to get another shipment of merchandise.

185.    Abdullah, Raqib, S-3, and UCEs 1 and 2 all helped load four 46" Toshiba HDTVs into Abdullah's Ford Ranger and six of them into Raqib's Chevrolet pickup. Abdullah told Raqib to follow them to where they were taking the TVs. Abdullah drove his Ford Ranger and told S-3, who was in the passenger seat, to look for suspicious people watching them. Abdullah also told S-3 that he likes to take the streets through neighborhoods because it is safer. S-3 believes that Abdullah was saying that it is easier to detect cars following them through neighborhood streets than on highways. Abdullah told S-3 they were going to Muhammad Abdul Salaam's house.

186.    Once they got to Salaam's house, the group unloaded the ten televisions into it. Salaam had a section of the living room cleared of all the furniture to make room for the TVs. Also, on a table in the room was a television identical to the ones that they received the last time they fenced them. Once the TVs were unloaded, Raqib departed. Salaam assured the group that the televisions would be safe in his house.

187.    Shortly after they arrived, Salaam started making phone calls on his cell phone to people about the televisions. During one call, Salaam told the individual that they had the TVs and that they were $600.00 each. Salaam said that "Wayne," a.k.a. Abdul Saboor, was trying to sell them for $500.00 each. Salaam and Abdullah were not happy that Saboor told them $500.00 because that meant he was not making a profit for himself over Abdullah's price of $500. Salaam bragged about being a hustler. Salaam and Abdullah suggested that Saboor was too nice in giving the guy the price of $500.00. They joked that he should not try to be a dealer, but rather he should stick to killing because he is good at it.

### Tenth UCO Transaction

188.    On October 7, 2009, Abdullah Beard called S-3 and said that he was going to meet with UCE-1, whom Beard knows as "John." S-3 drove to Beard's house to pick him up. S-3 and Beard went to the Hard Rock Café in Detroit. There, UCE-1 gave S-3 and Beard information about the laptop computers and power tools that he was able to steal for them to fence. UCE-1 told Beard that he has "something big" planned for the end of the month and asked if they could supply manpower. Beard said that they would like to do something big.

189.    Later that evening, S-3 told Abdullah that UCE-1 had 15 laptop computers and 54 power tool kits, and gave Abdullah the specifics which he received from UCE-1. Abdullah did the math and figured out how much he would charge for the laptops and power tools.

190.    On October 8, 2009, S-3 attempted to call Abdullah but Abdullah did not answer, so S-3 called Muhammad Abdul Salaam. Salaam said that Abdullah told him about the items and asked S-3 the specifics about the laptops. S-3 asked Salaam if he could help them transport the items in his pick up truck. Salaam was unable to help because he was watching his children, but offered the use of his truck if need be. S-3 asked Salaam if they were bringing the items back to his house on Genessee Street as they had in the past, and Salaam said yes.

191.          At approximately 11:00 a.m., S-3 went to Abdullah's house where Abdullah was already waiting in his Ford Ranger pick up truck. S-3 traveled in his vehicle and Abdullah drove his Ranger to the warehouse in order to meet with UCE-1 to get the laptops and tools. Abdullah and S-3 met with UCEs 1 and 2. Abdullah paid UCE-1 $1,500.00. They loaded the laptops and some of the tools into S-3's vehicle, and the tool kits into Abdullah's truck. Abdullah took one of the 15 laptops for himself. Abdullah and S-3 then drove to Muhammad Abdul Salaam's house and unloaded the merchandise. S-3 was able to see the items going into the house as well as the television that Salaam had obtained from one of the prior deals with UCE-1. Abdullah told Salaam that they were paying $20 each for 54 tool kits, and that he wanted $40 each in return.

192.          S-3 and Abdullah returned back to the warehouse and loaded the remaining tool kits into Abdullah's truck. UCE-1 warned Abdullah that none of the laptops could be returned to the store because they would have been reported stolen. Abdullah told UCE-1 that they would get the remainder of the money they owed him as fast as possible, and asked how long he would be in Detroit.

193.          UCEs 1 and 2 explained to Abdullah that they are going to steal a large truckload of goods at the end of October, and they will need people to help physically move the items off the truck. Abdullah said that they would help and agreed that he would get the same people that had helped UCE-1 in the past and could get more help if necessary.

194.          Abdullah and S-3 returned to Salaam's house with the remainder of the tools and unloaded them as they did previously. Abdullah told Salaam to make sure that people know the laptops can not be returned to a store because they will get in trouble. Abdullah said that he needed 6 laptops to take to Abdul Saboor's house because he had them sold already. Abdullah also took one of the tool kits to Saboor to see if he could sell them. Abdullah and S-3 left Salaam's house.

**CONCLUSION**

195.    Therefore, in light of the foregoing, I submit there is probable cause to believe that:

196.    **Luqman Ameen Abdullah** (a.k.a Christopher Thomas) has committed, or aided and abetted others in committing, violations of federal law, to whit:    18 U.S.C. § 371 (conspiracy to commit federal crimes, including 18 U.S.C. § 2315, sale or receipt of stolen goods transported in interstate commerce, and 18 U.S.C. § 1341, mail fraud); 18 U.S.C. § 922(d) (providing firearms or ammunition to a person known to be a convicted felon); 18 U.S.C. § 922(g) (possession of firearms or ammunition by a convicted felon); 18 U.S.C. § 931 (possession of body armor by a person convicted of a violent felony); and 18 U.S.C. § 511 (altering or removing motor vehicle identification numbers).

197.    **Mohammad Abdul Bassir** (a.k.a. Franklin D. Roosevelt Williams) has committed, or aided and abetted others in committing, violations of federal law, to whit: 18 U.S.C. § 371 (conspiracy to commit federal crimes, including 18 U.S.C. § 2315, sale or receipt of stolen goods transported in interstate commerce, and 18 U.S.C. § 1341, mail fraud); 18 U.S.C. § 922(d) (providing firearms or ammunition to a person known to be a convicted felon); 18 U.S.C. § 922(g) (possession of firearms or ammunition by a convicted felon); and 18 U.S.C. § 511 (altering or removing motor vehicle identification numbers).

198.    **Muhammad Abdul Salaam** (a.k.a. Muhammad Addul Salaam, a.k.a. Gregory Stone, a.k.a. Gun Man, a.k.a. Norman Shields) has committed, or aided and abetted others in committing, violations of federal law, to whit:    18 U.S.C. § 371 (conspiracy to commit federal crimes, including 18 U.S.C. § 2315, sale or receipt of stolen goods transported in interstate commerce).

199.    **Abdul Saboor** (a.k.a. Dwayne Edward Davis), has committed, or aided and abetted others in committing, violations of federal law, to whit:    18 U.S.C. § 371 (conspiracy to commit federal crimes, including 18 U.S.C. § 2315, sale or receipt of stolen goods transported in interstate commerce).

200.    **Mujahid Carswell** (a.k.a. Mujahid Abdullah), has committed, or aided and abetted others in committing, violations of federal law, to whit:    18 U.S.C. § 371 (conspiracy to commit federal crimes, including 18 U.S.C. § 2315, sale or receipt of stolen goods transported in interstate commerce).

201.    **Abdullah Beard** (a.k.a. Detric Lamont Driver), has committed, or aided and abetted others in committing, violations of federal law, to whit:    18 U.S.C. § 371 (conspiracy to commit federal crimes, including 18 U.S.C. § 2315, sale or receipt of stolen goods transported in interstate commerce).

202.    **Mohammad Philistine** (a.k.a. Mohammad Palestine, a.k.a. Mohammad Al-Sahli), has committed, or aided and abetted others in committing, violations of federal law, to whit:  18

42

U.S.C. § 371 (conspiracy to commit federal crimes, including 18 U.S.C. § 2315, sale or receipt of stolen goods transported in interstate commerce).

203.        **Yassir Ali Khan** has committed, or aided and abetted others in committing, violations of federal law, to whit:    18 U.S.C. § 371 (conspiracy to commit federal crimes, including 18 U.S.C. § 2315, sale or receipt of stolen goods transported in interstate commerce).

204.        **Adam Hussain Ibraheem** has committed, or aided and abetted others in committing, violations of federal law, to whit:    18 U.S.C. § 371 (conspiracy to commit federal crimes, including 18 U.S.C. § 2315, sale or receipt of stolen goods transported in interstate commerce).

205.        **Garry Laverne Porter** (a.k.a. Mujahid) has committed, or aided and abetted others in committing, violations of federal law, to whit:        18 U.S.C. § 922(g) (possession of firearms or ammunition by a convicted felon).

206.        **Ali Abdul Raqib** has committed, or aided and abetted others in committing, violations of federal law, to whit:        18 U.S.C. § 371 (conspiracy to commit federal crimes, including 18 U.S.C. § 2315, sale or receipt of stolen goods transported in interstate commerce).

GARY LEONE
Special Agent, FBI

Subscribed to and sworn before me
this 27th day of October, 2009.

HONORABLE DONALD A. SCHEER
United States Magistrate Judge

43